**Hyung Joon KIM, Petitioner–Appellee,**

v.

**James W. ZIGLAR, Commissioner; John Ashcroft,\* Attorney General, Respondents–Appellants.**

**No. 99–17373.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 2001

Filed Jan. 9, 2002

\* James W. Ziglar, Commissioner, is substituted for his predecessor, Thomas Schiltgen, and John Ashcroft, Attorney General, is substituted for his predecessor, Janet Reno, Fed. R.App. P. 43(c)(2).

Mark Walters, Office of Immigration Litigation, Washington, D.C., for the respondents-appellants.

Judy Rabinovitz, American Civil Liberties Union, New York, New York, for the petitioner-appellee.

Before: HUG, NOONAN, and W. FLETCHER, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge:

We consider a constitutional challenge to § 236(c) of the Immigration and Nationali-

ty Act ("INA"), 8 U.S.C. § 1226(c), which requires that the Attorney General take into custody, and detain without bail, certain categories of aliens during the pendency of removal proceedings against them.

Petitioner Hyung Joon Kim, a citizen of Korea, came to the United States in 1984 at the age of six. Two years later, at the age of eight, he became a lawful permanent resident alien. In July 1996, at the age of 18, he was convicted of first degree burglary in California state court. In August 1997, he was convicted in California state court of petty theft with priors, and was sentenced to three years imprisonment. The day after his release from state custody, the Immigration and Naturalization Service ("INS") detained Kim pursuant to 8 U.S.C. § 1226(c)(1)(B), on the ground that his second conviction qualified as an "aggravated felony" under 8 U.S.C. § 1101(a)(43), which in turn made him removable under 8 U.S.C. § 1227(a)(2)(A)(iii).

On May 17, 1999, after more than three months in INS custody, Kim filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, arguing that the no-bail provision of § 1226(c) violates the Due Process Clause of the Fifth Amendment. On August 10, 1999, after Kim had been in custody for six months, the district court held § 1226(c) unconstitutional on its face and ordered the INS to hold a bail hearing to determine Kim's risk of flight and dangerousness. In lieu of holding a bail hearing, the INS released Kim on a $5,000 bond. A hearing before an Immigration Judge ("IJ") to determine Kim's removability is scheduled for March 2002. The INS appeals from the judgment of the district court.

■ Although Kim is no longer in custody, the case continues to present a live controversy because the INS states that it will take Kim into custody and hold him without bail if we reverse. The district court had jurisdiction pursuant to 28 U.S.C. § 2241. *See INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 2278, 150 L.Ed.2d 347 (2001). We have jurisdiction under 28 U.S.C. § 1291.

■ We do not hold in this case that the unavailability of bail under § 1226(c) is unconstitutional on its face. We do hold, however, that it is unconstitutional as applied to lawful permanent resident aliens.

I

The INS detained Kim pursuant to 8 U.S.C. § 1226(c), a provision passed as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104–208, 110 Stat. 3009. The section as a whole is entitled "Detention of criminal aliens." Section 1226(c)(1) provides, in relevant part,

> The Attorney General shall take into custody any alien who—
>
>> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>>
>> (B) *is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,*
>>
>> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or
>>
>> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title, when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to

whether the alien may be arrested or imprisoned again for the same offense. (Emphasis added.)

Three things are notable about § 1226(c)(1). First, no bail is allowed during the pendency of removal proceedings. This is true even for aliens who are not flight risks and do not pose any threat to the public. Second, a wide range of past conduct triggers removal proceedings and detention without bail. Much of that conduct is non-violent and poses little threat to the physical safety of the public. *See* discussion in Part V.B, *infra.* Third, the no-bail provision of § 1226(c)(1) contrasts with the availability of bail under § 1231(a)(6). Section 1226(c)(1) prohibits bail for aliens during the pendency of their removal proceedings—that is, during the period before determination of removability and before entry of any removal order. By contrast, § 1231(a)(6) allows bail for aliens against whom a final removal order has been entered, once 90 days have elapsed since the entry of the order. *See* discussion in Part VI, *infra.*

Only one category of alien is exempt from the no-bail requirement of § 1226(c). Section 1226(c)(2) provides for release of government witnesses or those assisting government investigations. Kim has not served as a government witness or assisted in any government investigation, and is therefore not entitled to release from detention under this provision.

## II

The district court sustained a facial constitutional challenge to § 1226(c). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

We recently reaffirmed the vitality of the *Salerno* standard outside of First Amendment cases. *See S.D. Myers, Inc. v. City and County of San Francisco,* 253 F.3d 461, 467 (9th Cir.2001) ("While we have held that [*Planned Parenthood v.*] *Casey* [505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)] overruled *Salerno* in the context of facial challenges to abortion statutes, we will not reject *Salerno* in other contexts until a majority of the Supreme Court clearly directs us to do so.") (citation and quotation marks omitted).

We do not affirm the district court's facial invalidation of § 1226(c). We are not prepared to hold, on the record in this case, that detention under the statute would be unconstitutional in all of its possible applications. For example, the statute also applies to aliens who have not "entered" the United States. In *Barrera–Echavarria v. Rison,* 44 F.3d 1441 (9th Cir.1995) (en banc), we wrote that "[b]ecause excludable aliens are deemed under the entry doctrine not to be present on United States territory, a holding that they have no substantive right to be free from immigration detention reasonably follows." *Id.* at 1450. The Supreme Court noted the importance of the distinction between aliens who have "entered" and those who have not in *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 2500, 150 L.Ed.2d 653 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."). Further, the status of an alien who has been paroled into the United States pursuant to 8 U.S.C. § 1182(d)(5) is the same as that of an alien detained at the border: such an alien has not "entered" the United States. *See* 8 U.S.C. § 1182(d)(5)(A) ("such parole of such alien shall not be regarded as an admission of the alien"); *Leng May Ma v. Barber,* 357

U.S. 185, 188–90, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958); *Alvarez–Mendez v. Stock,* 941 F.2d 956, 961 n. 4 (9th Cir.1991) ("[A]n excludable alien may be paroled into the United States, in which case the law treats him as if he never entered the country and 'exclusion' remains the procedure for removing him."). The detention of aliens who have not "entered" the United States is not before us, and we are not prepared to address, on the record compiled in this case, whether such detention is unconstitutional.

■ We therefore stop short of affirming the district court's holding that § 1226(c) is facially unconstitutional. However, "we may affirm on any basis supported by the record." *Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 387 (9th Cir.1994). In the present appeal, there is evidence in the record sufficient to permit us to consider this case as an as-applied challenge. We affirm the district court's grant of habeas corpus relief to petitioner Kim on the ground that the statute is unconstitutional as applied to him in his status as a lawful permanent resident alien who has entered the United States.

## III

Lawful permanent resident aliens are the most favored category of aliens admitted to the United States. They have the most ties to the United States of any category of aliens. About seventy percent of lawful permanent resident aliens are admitted because of family members already in the United States. These family members are either United States citizens or, less commonly, other lawful permanent resident aliens. *See* 8 U.S.C. § 1153(a). The next largest group of lawful permanent resident aliens are highly educated or exceptionally skilled professionals who can contribute in important ways to the educational institutions and economy of the United States. *See* 8 U.S.C. § 1153(b).

Unlike almost all other aliens, lawful permanent resident aliens have the right to apply for United States citizenship. They also have the right, without limitation, to work in the United States. Of particular relevance to this case, lawful permanent resident aliens have the right to reside permanently in the United States. They retain that right until a final administrative order of removal is entered. *See* 8 U.S.C. § 1101(a)(20); 8 C.F.R. § 1.1(p).

■ An administrative order of removal cannot be entered against Kim until, at the earliest, an IJ finds that he is removable. That order will not be final until the Board of Immigration Appeals ("BIA") affirms it, or until the period for seeking BIA review has expired. *See* 8 U.S.C. § 1101(a)(47)(B). Until there is a final removal order, Kim's right to remain in the United States is a matter of law, not grace. *See* 8 C.F.R. § 1.1(p) ("The term *lawfully admitted for permanent residence* means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed. Such status terminates upon entry of a final administrative order of exclusion or deportation.") (emphasis in original); *see also Foroughi v. INS,* 60 F.3d 570, 575 (9th Cir.1995).

A lawful permanent resident alien has an obvious and important personal interest in his or her own liberty during the pendency of removal proceedings. This interest is important even if the alien is held, at the end of the proceedings, to be removable. A lawful permanent resident alien usually has family members (in most cases, American citizens) who are in the United

States and will remain here after the alien is removed. The alien is facing the prospect of long-term separation, and if the no-bail provision is valid he or she will be unable to see his or her son, daughter, husband, wife, father, or mother except in detention facilities during the pendency of the removal proceedings. Such facilities are sometimes at great distances from where the alien lived and where the family members live. Further, many lawful permanent resident aliens own property and/or businesses. Not allowing the alien to wind up his or her affairs in an orderly and advantageous way will work to the disadvantage not only of the alien, but of all those (including American citizens) who depend on the property or business for their economic well-being.

## IV

 The government argues that the statute is constitutional, even as applied, because decisions about aliens fall within Congress' plenary powers. We do not question the general power that Congress exercises over immigration matters. "Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting *Shaughnessy v. U.S. Ex Rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). Indeed, "over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Id.* (quotation marks omitted). Hence aliens are not entitled to the same protections as citizens. "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 79–80, 96 S.Ct. 1883, 48 L.Ed.2d 478

(1976). Further, it has long been recognized that Congress has a general power to detain aliens pursuant to seeking their removal from the United States. *See Wong Wing v. United States*, 163 U.S. 228, 235, 16 S.Ct. 977, 41 L.Ed. 140 (1896) ("We think it clear that detention or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens, would be valid.").

The question before us, however, is more specific. It is whether Congress has adopted a constitutionally permissible means of detention and removal of lawful permanent resident aliens. On this question we take guidance from *Zadvydas*, in which the Supreme Court last Term addressed detention of aliens under 8 U.S.C. § 1231(a)(6). That section authorizes the Attorney General to detain certain categories of aliens who have been found removable, after the expiration of the 90–day removal period. In *Zadvydas*, aliens who had been found removable were being detained indefinitely under the statute because no country would accept them. They challenged their detention under the Due Process Clause, the same clause upon which Kim relies.

 The government made the same plenary powers argument in *Zadvydas* that it makes to us, but the Supreme Court rejected it. The Court did not "deny the right of Congress to remove aliens, to subject them to supervision with conditions when released from detention, or to incarcerate them where appropriate for violations of those conditions." 121 S.Ct. at 2501. But the Court confined the argument by indicating that Congress' power with respect to aliens "is subject to important constitutional limitations." *Id.* The Court drew support from its earlier decision in *INS v. Chadha*, 462 U.S. 919, 103

S.Ct. 2764, 77 L.Ed.2d 317 (1983), which emphasized that Congress must choose "a constitutionally permissible means of implementing" its plenary power over aliens, and that Congress can exercise that power only if it "does not offend some other constitutional restriction." *Id.* at 941, 103 S.Ct. 2764 (quotation marks omitted).

 *Zadvydas* reaffirmed the principle that aliens are entitled to protection under the Due Process Clause. The Court stated that "the Due Process Clause applies to all 'persons' within the United States, including aliens." 121 S.Ct. at 2500. Even for aliens, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Id.* at 2498. The Court noted that it has upheld civil, or "nonpunitive," detention only in those limited circumstances where the government has provided a "special justification" outweighing the individual's liberty interest:

> [G]overnment detention violates [the Due Process] Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections, or, *in certain special and narrow nonpunitive circumstances,* where a *special justification,* such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint.

*Id.* at 2498–99(quotation marks, alterations, and citations omitted; emphasis altered from original).

The Court in *Zadvydas* concluded that the statute before it was non-punitive and regulatory rather than criminal, and analyzed the detention provision to determine whether the government had provided a "special justification" that would justify detention. The government argued that detention was necessary to prevent removable aliens from fleeing and to prevent danger to the community. *Id.* at 2499. The *Zadvydas* Court rejected the government's arguments, concluding that "[t]here is no sufficiently strong special justification here for indefinite civil detention." *Id.* To avoid the constitutional problems that would have been posed by the indefinite detention of removable aliens, the Court held that detention under § 1231(a)(6) is subject to a "reasonable time" limitation. *Id.* at 2495. *See also Ma v. Ashcroft,* 257 F.3d 1095 (9th Cir. 2001) (reinstated opinion following remand) ("*Ma II*").

## V

 In this case, as in *Zadvydas,* it is clear that the statute authorizing detention is civil and regulatory, not criminal or punitive. The detention authorized by § 1226(c) is ostensibly designed to ensure that aliens are removed, and it is established law that removal proceedings are civil. *See INS v. Lopez–Mendoza,* 468 U.S. 1032, 1038, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). Following *Zadvydas,* we thus must analyze § 1226(c) to determine whether the government has provided a sufficiently strong "special justification" to justify civil detention of a lawful permanent resident alien.

The government advances five justifications for no-bail civil detention under § 1226(c): (1) preventing criminal aliens from absconding so that they can be expeditiously removed as required by law, (2) protecting public safety from the presence of potentially dangerous criminal aliens, (3) making the removal of criminal aliens a top priority of immigration enforcement, (4) correcting the failure of the prior laws which permitted release on bond, and (5) repairing damage to America's immigration system.

The last three justifications are so general that they amount to little more than saying that the "justification" of the statute is to make deportation a priority and to make things better. The two principal justifications are those listed first: (1) preventing criminal aliens from fleeing during removal proceedings; and (2) protecting the public from potentially dangerous aliens. It was these two justifications that the Supreme Court considered—and found insufficient—in *Zadvydas*. We treat them in order.

### A. Risk of flight

The government argues that it must detain aliens such as Kim to prevent them from fleeing pending the completion of their removal proceedings. The government contends that under IIRIRA, unlike under the prior statute, removal is virtually certain once removal proceedings have begun. Therefore, argues the government, an alien in removal proceedings has little hope of avoiding removal and correspondingly little incentive to appear for his removal hearing. *See also Parra v. Perryman,* 172 F.3d 954, 958 (7th Cir.1999) ("Before the IIRIRA[,] bail was available ... as a corollary to the possibility of discretionary relief from deportation; now that this possibility is so remote, so too is any reason for release pending removal."). The government thus contends that without no-bail detention, it will be unable to ensure that removable aliens will actually be removed.

We are not persuaded. First, IIRIRA did not eliminate all avenues of relief for persons subject to § 1226(c). An alien convicted of an aggravated felony may be eligible for withholding of removal if (1) removal to a particular country might threaten the alien's life or freedom because of the alien's race, religion, nationality, membership in a particular social group, or political opinion, and (2) the alien has not participated in persecution, has not committed a particularly serious crime, and does not pose a danger to the United States. *See* 8 U.S.C. § 1231(b)(3)(A), (B). An alien may also receive relief under the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. *See Kamalthas v. INS,* 251 F.3d 1279 (9th Cir.2001).

Second, the Supreme Court's recent decision in *St. Cyr,* rendered since the government's briefs were filed, upheld habeas corpus relief for aliens subject to removal because of a prior conviction for an aggravated felony conviction. 121 S.Ct. at 2293. The Court held that discretionary relief under former INA § 212(c) was preserved for a large category of aliens removable because of an aggravated felony. The Court held that "§ 212(c) relief remains available for aliens ... whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." *Id.* The preservation of § 212(c) relief is particularly important in providing a defense to removal. The Court noted that 90% of convictions are through guilty pleas, *see id.* at 2292 n. 51, and that in the past more than 50% of the applications for § 212(c) relief were granted. *Id.* at 2277 n. 5. The Court observed, further, that because IIRIRA expanded the definition of aggravated felony to include "more minor crimes which may have been committed many years ago," it is likely "that an increased percentage of applicants will meet the stated criteria for § 212(c) relief." *Id.* at n. 6.

Third, some aliens detained under the statute may be able to demonstrate that the conviction for which the INS seeks to remove them was not an aggravated felony. At the very least, the broad and

somewhat uncertain sweep of the statutory definitions of aggravated felony ensures that there will be many disputes on the margins. We have held, against the contention of the government, that certain convictions do not qualify as aggravated felony convictions. *See, e.g., Chowdhury v. INS,* 249 F.3d 970 (9th Cir.2001) (holding that conviction for laundering $1,300 was not an aggravated felony); *Sareang Ye v. INS,* 214 F.3d 1128 (9th Cir.2000) (holding that state-law offenses of vehicle burglary did not make alien eligible for removal because they were neither "burglaries" nor "crimes of violence" under the INA).

In addition to relying on increased flight risk allegedly resulting from the passage of IIRIRA, the government relies on a 1997 report, prepared by the Department of Justice Office of the Inspector General. *See* Inspection Report, "Immigration and Naturalization Service Deportation of Aliens After Final Orders Have Been Issued," Rep. No. I–96–03 (March 1996), *available at* http://www.usdoj.gov/oig/i9603/i9603.htm ("Report"). The Report concluded that 89% of "nondetained" aliens subject to a final removal order failed to appear for removal when ordered to do so. *See id.* at 8–9. The government relies on the 89% "skip rate" to argue that no-bail detention under § 1226(c) is necessary to ensure appearance at the removal hearing.

The Report is based on a study of the files of 1,058 randomly selected aliens who were issued final deportation orders. The files were divided into two categories, "detained" and "nondetained" aliens. Of the "detained aliens," 94% were "successfully deported." *Id.* at 6. Most of the remaining 6% were not "successfully deported" for innocent reasons. For example, half were not deported for political or humanitarian reasons. *Id.* Of the "nondetained aliens," 89% fled to avoid deportation. *Id.* at 11–12.

The government makes a fundamental factual error in relying on the 89% figure in the Report. That figure applies to "nondetained aliens." Aliens released on bail were "detained" rather than "nondetained" as those categories are defined in the Report. *Id.* at 6.[1] The 89% figure is thus inapplicable to aliens released on bail.

The Report concluded, "Based on the results of our sample of 1,058 cases, it is clear that most of the aliens actually deported were detained, and few of the nondetained aliens were deported. *Detention is key to effective deportation.*" *Id.* at 14 (emphasis added). When the Report thus recommended "detention" as "key to effective deportation," it recommended precisely what Kim seeks and the government opposes.

### B. Danger to the public

We next consider the government's interest in protecting the public from dangerous aliens released pending removal proceedings. Existing Supreme Court precedents establish that civil detention will

---

1. In the section entitled "Removal of Detained Aliens," the Report states:

> We reviewed 402 *detained alien case files.* INS deported 376, or almost 94 percent of all the aliens. The 26 aliens not deported included 13 of nationalities that could not be deported for political or humanitarian reasons, 4 for whom INS was unable to obtain travel documents, 2 pending travel arrangements, 2 who had been granted administrative relief, *2 who had been released on bond and then absconded,* 1 with a Federal appeal pending, 1 pending prosecution for illegal entry after a previous deportation, and 1 who had been indicted for murder and turned over to the local police department.

*Id.* at 6 (emphasis added). Since those "released on bond" were counted among the "detained alien case files," it is obvious that such aliens were categorized as "detained aliens."

be upheld only when it is narrowly tailored to people who pose an unusual and well-defined danger to the public. In such cases the government has had the burden of proving that the particular individual meets the criteria for detention.

In *Salerno,* 481 U.S. 739, 747, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Supreme Court upheld the constitutionality of pre-trial detention of people accused of "the most serious of crimes," namely "crimes of violence, offenses for which the sentence is life imprisonment or death, serious drug offenses, or certain repeat offenders." 481 U.S. at 747, 107 S.Ct. 2095. But *Salerno* required the government to do more than merely charge a person with a serious crime: "In a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Id.* at 750, 107 S.Ct. 2095.

In *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), the Supreme Court upheld Kansas' "Sexually Violent Predator Act," which permitted civil detention of people with a "mental abnormality" or "personality disorder" that rendered them likely to commit "predatory acts of sexual violence." *Id.* at 352, 117 S.Ct. 2072. Even though the statute's application was confined to "a small segment of particularly dangerous individuals," *id.* at 368, 117 S.Ct. 2072, the Court cautioned that "[a] finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment." *Id.* at 358, 117 S.Ct. 2072. The Kansas statute required an additional finding of mental illness, thus further "limit[ing] involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control."

*Id.* The combination of the dangerousness finding and the mental illness finding—both of which the government had to prove beyond a reasonable doubt—rendered the detention permissible. *See also Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (requiring the state to prove by clear and convincing evidence that a person is mentally ill and requires hospitalization to protect himself and others before commitment to a mental institution satisfies due process).

In *Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), the Supreme Court struck down a Louisiana statute under which a defendant found not guilty by reason of insanity was civilly detained until the defendant proved that he or she was not dangerous. The Court observed that "[u]nlike the sharply focused scheme at issue in *Salerno,* the Louisiana scheme of confinement is not carefully limited." *Id.* at 81, 112 S.Ct. 1780. The scheme did not require the government to find that the person to be detained was presently mentally ill. And it did not carefully restrict its application to the most dangerous, in part as a result of the fact that "the statute place[d] the burden on the detainee to prove that he is not dangerous." *Id.* at 82, 112 S.Ct. 1780.

The civil detention schemes upheld by the Supreme Court in *Salerno* and *Hendricks* contrast sharply with pre–adjudication civil detention under § 1226(c). The critical difference is that § 1226(c) contains no provision for an individualized determination of dangerousness. *Carlson v. Landon,* 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952), on which the government places great weight, is not to the contrary. In *Carlson,* the petitioners were detained aliens who were members of the Communist party. The detention statute in question, enacted during the Cold War, deemed members of the Communist party a threat

to national security because of the Communist party's advocacy of violent revolution. The Court upheld a rebuttable presumption of detention for members of the Communist party. It wrote, "Detention is necessarily a part of th[e] deportation procedure. Otherwise aliens arrested for deportation would have opportunities to hurt the United States during the pendency of deportation proceedings." *Id.* at 538, 117 S.Ct. 2072.

But in *Carlson* there was only a presumption, not a certainty, of detention, and the possibility of discretionary release pending the proceedings was central to the Court's approval of the detention scheme: "Of course purpose to injure could not be imputed generally to all aliens subject to deportation, so discretion was placed by the 1950 Act in the Attorney General. . . ." *Id.* Moreover, the Court noted in *Carlson* that detention without bail was exceptional: "There is no evidence or contention that all persons arrested as deportable . . . for Communist membership are denied bail. In fact, a report filed with this Court . . . at our request shows allowance of bail in the large majority of cases." *Id.* at 541–42, 72 S.Ct. 525. By contrast, under § 1226(c), bail is simply never allowed.

Finally, the government argues that § 1226(c) "relies on actual egregious crimes or conduct of convicted criminals as conclusive evidence that the alien is a 'public menace.'" This argument is insufficient to justify a blanket denial of bail, for "aggravated felonies," as defined in the statute, are not all "egregious"; nor do they "conclusively" establish the people who have committed them are menaces to the public.

Recent decisions of this circuit demonstrate the wide range of crimes that meet the statutory definition of aggravated felony. *See, e.g., United States v. Castillo–Rivera,* 244 F.3d 1020 (9th Cir.2001) (state

felon in possession); *Park v. INS,* 252 F.3d 1018 (9th Cir.2001) (involuntary manslaughter); *Albillo–Figueroa v. INS,* 221 F.3d 1070 (9th Cir.2000) (possession of counterfeit obligations). The definition of aggravated felony includes trafficking in vehicles with altered identification numbers, *see* § 1101(a)(43)(R), and obstructing justice, *see* § 1101(a)(43)(S). Many of these provisions include crimes "relating to" those crimes. *See, e.g.,* § 1101(a)(43)(S) (defining aggravated felony as "an offense relating to obstruction of justice").

Given the range of crimes qualifying as aggravated felonies, the government simply cannot show that § 1226(c) covers only aliens who pose an especially serious danger to the public. Moreover, the fact of a prior conviction alone, without any individualized consideration of the dangerousness of the underlying crime or of the individual's present condition, can be unreliable evidence of dangerousness. Not only may the crime itself have failed to indicate dangerousness; the conviction rendering the alien removable may also have occurred many years ago, and the alien may have led a law-abiding life since that time.

In sum, we believe that here, too, the government has failed to carry its burden. It has failed to demonstrate that the fact that some aliens may be dangerous justifies civil detention, without bail, of all lawful permanent resident aliens who have been charged with removability.

## VI

Outside the four corners of this litigation, the government itself appears to have some doubt about whether no-bail civil detention is a desirable—let alone a necessary—means of dealing with aliens subject to removal proceedings. First, the INS has questioned the wisdom and

efficacy of § 1226(c), and has brought to Congress' attention the need for alternative means of ensuring that aliens appear for their removal proceedings. In testimony before the Senate Subcommittee on Immigration, then-Commissioner of the INS Doris Meissner stated that "we are actively exploring alternatives to detention for ensuring that aliens for whom release from custody is appropriate appear for their scheduled hearings." Immigration and Naturalization Oversight Hearings on INS Reform: Detention Issues, Before the Subcomm. on Immigration of the Senate Judiciary Comm., Testimony of INS Commissioner Doris Meissner, *available at* 1998 WL 767401 (F.D.C.H.) (Sep. 16, 1998). Commissioner Meissner also questioned the need for mandatory detention:

> Most of the people for whom Custody is mandatory are people we want removed from the United States. However, in some cases, no purpose is served by maintaining the person in custody during the entire process. Accordingly, while we agree that we have discretion to determine whether to pursue removal, we firmly believe that determination should not be dictated by whether the person's custody will be mandated by the statute.

*Id.* We are reluctant to uphold civil detention impinging on fundamental liberty interests, based on a government policy the need for which the implementing agency has itself questioned.

Second, current law allows bail to aliens who have already been ordered removed once 90 days have passed since the entry of the removal order. *See* 8 U.S.C. § 1231(a)(6) ("An alien ordered removed ... *may* be detained beyond the [90–day] removal period and, *if released,* shall be subject to the terms of supervision in paragraph (3)." (emphasis added)). If aliens subject to a final order of removal may be released on bail, it makes little sense to deny bail to those who are in removal proceedings but have not yet been ordered removed. The incentives to flee are greater for an alien already ordered removed than for an alien still in removal proceedings. Further, an alien ordered removed is likely to be more dangerous on average than an alien in removal proceedings, since the ground for removal (which may be dangerous conduct) will have been found rather than merely alleged. Yet despite the greater likelihood of flight and dangerousness of aliens already ordered removed, § 1231(a)(6) permits their release on bail. The availability of bail for such aliens thus casts substantial doubt on the argument that aliens merely subject to removal proceedings are so likely to flee and so dangerous that there is a "special justification" warranting their detention without bail.

## VII

Following the approach of the *Zadvydas* majority, we thus conclude that the government has not provided a "special justification" for no-bail civil detention sufficient to overcome a lawful permanent resident alien's liberty interest on an individualized determination of flight risk and dangerousness. It is sufficient for our purposes to rely on the reasoning of the majority in *Zadvydas.* But we note that § 1226(c) also cannot pass constitutional muster under the alternative analysis set forth by Justice Kennedy in that case. *See Zadvydas,* 121 S.Ct. at 2507 (Kennedy, J., dissenting).

Justice Kennedy (joined by Chief Justice Rehnquist) disagreed with the *Zadvydas* majority's attempt to avoid a constitutional problem by adopting a limiting construction of the statute. Justice Kennedy argued that the proper constitutional test was whether the detention was arbitrary

or capricious. "[B]oth removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious." *Id.* at 2515. He argued that "[i]t is neither arbitrary nor capricious to detain the aliens when necessary to avoid the risk of flight or danger to the community," *id.*, but that such detention requires strict procedural safeguards. He wrote:

Whether a due process right is denied when removable aliens who are flight risks or dangers to the community are detained turns ... not on the substantive right to be free, but on whether there are adequate procedures to review their cases, allowing persons once subject to detention to show that through rehabilitation, new appreciation of their responsibilities, or under other standards, they no longer present special risks or danger if put at large.

*Id.*

Justice Kennedy then went through a detailed analysis of the regulations governing post-removal-period detention under § 1231(a)(6). First, he noted that the procedures for finding an alien removable in the first instance require that the government prove its case by clear and convincing evidence, and that the alien be given the right to appeal this decision, to move for reconsideration, or to seek discretionary cancellation of removal. "As a result, aliens ... do not arrive at their removable status without thorough, substantial procedural safeguards." *Id.* at 2514.

Second, Justice Kennedy pointed to the regulations promulgated under the statute. The majority in *Zadvydas* summarized these provisions:

[T]he INS District Director will initially review the alien's records to decide whether further detention or release under supervision is warranted after the 90– day removal period expires. 8 C.F.R. § 241.4(c)(1), (h), (k)(1)(i) (2001).

If the decision is to detain, then an INS panel will review the matter further, at the expiration of a 3–month period or soon thereafter. § 241.4(k)(2)(ii). And the panel will decide, on the basis of records and a possible personal interview, between still further detention or release under supervision. § 241.4(i). In making this decision, the panel will consider, for example, the alien's disciplinary record, criminal record, mental health reports, evidence of rehabilitation, history of flight, prior immigration history, and favorable factors such as family ties. § 241.4(f). To authorize release, the panel must find that the alien is not likely to be violent, to pose a threat to the community, to flee if released, or to violate the conditions of release § 241.4(e). And the alien must demonstrate "to the satisfaction of the Attorney General" that he will pose no danger or risk of flight. § 241.4(d)(1). If the panel decides against release, it must review the matter again within a year, and can review it earlier if conditions change. §§ 241.4(k)(2)(iii), (v).

*Id.* at 2495.

Justice Kennedy found these procedures constitutionally sufficient, analogizing them to the procedures involved in parole-eligibility and parole-revocation determinations. *Id.* at 2516. He concluded that "the procedural protection here is real, not illusory," and cited to statistics showing that aliens often succeeded in securing their release. *Id.* Indeed, between February 1999 and mid-November 2000, more than half of the roughly 6,200 aliens who received individualized custody reviews before the end of the 90–day removal period were released. *Id.* (citing 65 Fed. Reg. 80285 (2000)).

The procedures that Justice Kennedy found sufficient to save the statute before the Court in *Zadvydas* from unconstitu-

tionality are entirely absent from § 1226(c). Accordingly, if we were to apply Justice Kennedy's analysis in *Zadvydas* to the facts of this case, we would conclude that detention under § 1226(c) is arbitrary and capricious and therefore violates due process.

## VIII

Two courts of appeals have addressed the constitutionality of no-bail detention under § 1226(c). The Third Circuit has just held, as we do in this case, that detention of a lawful permanent resident alien without an individualized bail hearing is unconstitutional. *See Patel v. Zemski*, 275 F.3d 299 (3d Cir.2001). On the other hand, the Seventh Circuit has upheld the constitutionality of no-bail detention under § 1226(c) for all aliens. *See Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir.1999) ("Given the sweeping powers Congress possesses to prescribe the treatment of aliens, the constitutionality of § 1226(c) is ordained.") (citation omitted).

We believe that *Parra* was incorrectly decided. Not only was *Parra* decided prior to *Zadvydas*, in which the Court made clear that the government was required to provide a "special justification" for civil detention of aliens; it was also decided prior to the Court's decision in *St. Cyr*, which preserved § 212(c) discretionary relief and thus made a final removal order less likely for many aliens.

The panel in *Parra* also made two critical mistakes, one legal and one factual. First, *Parra* analyzed the liberty interest of the detained alien based on the erroneous legal assumption that he or she has no right to remain in the United States once removal proceedings have begun. In analyzing an alien's liberty interest in release during removal proceedings, *Parra* stated, "Persons subject to § 1226(c) have forfeited any *legal* entitlement to remain in the

United States[.] ... The private interest here is ... liberty *in the United States* by someone no longer entitled to remain in this country...." 172 F.3d at 958 (emphases in original). This is simply wrong. A lawful permanent resident alien such as Kim has a legal right to remain in the United States until a final removal order is entered against him. *See* discussion in Part III, *supra*.

Second, *Parra* relies on the Inspector General's Report for the proposition that there is an 89% "skip rate" for aliens subject to a final removal order. It wrote, "According to the Department [of Justice], approximately 90% of persons in *Parra*'s situation absconded *when released on bail* before the IIRIRA." *Id.* at 956 (emphasis added). This, too, is simply wrong. As discussed above, the skip rate for "detained aliens" was not 89% (which *Parra* rounds up to 90%). Rather, the skip rate for detained aliens was substantially less than 6%. As pointed out above, release on bail was included in the Report's definition of "detention," and the Report recommended "detention" thus defined as the "key to effective deportation." *See* discussion in Part V.A, *supra*.

## IX

We must consider whether we can adopt a construction of § 1226(c) that would allow us to avoid the constitutional question presented in this case. "[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." *St. Cyr*, 121 S.Ct. at 2279(citation omitted) (quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)). *See also Ma II*, 257 F.3d at 1106 ("The Supreme Court has long held that courts should interpret stat-

utes in a manner that avoids deciding substantial constitutional questions."). Kim argues that such a construction is possible, focusing on the "is deportable" language in § 1226(c). Kim urges us to construe "is deportable" to mean that the alien is subject to a final order of removal. A final order is not entered until, at a minimum, an IJ enters a final order finding the alien removable. Under this construction, the Attorney General would be without authority to detain aliens subject to removal proceedings under § 1226(c) because such aliens are not yet subject to final orders of removal.

 In construing a statute to avoid constitutional problems, we cannot adopt a "strained construction of the statute," *Ma v. Reno,* 208 F.3d 815, 827 (9th Cir.2000), *modified and reinstated by Ma II;* nor can we adopt a saving construction that is "plainly contrary to the intent of Congress." *United States v. X–Citement Video,* 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). "In performing our constitutional narrowing function, we may come up with any interpretation we have reason to believe Congress would not have rejected." *Ma II,* 257 F.3d at 1111(citation and quotation marks omitted).

 Considered in isolation, the "is deportable" language could mean "subject to a final order of removal entered by an IJ." But when considered in the context of the entire statute, such a construction is not available. The rest of the statute makes clear that the alien is subject to no-bail detention—that is, "is deportable"—as soon as he or she is released from custody for the criminal conviction that constitutes the aggravated felony providing the basis for removal. *See* 8 U.S.C. § 1226(c)(1) ("The Attorney General shall take into custody any alien ... *when the alien is released,* without regard to whether the alien is released on parole, supervised release, or probation, and without regard to wheth-

er the alien may be arrested or imprisoned again for the same offense.") (emphasis added). We are thus not at liberty to interpret the statute as postponing the application of the no-bail provision until after the completion of the alien's removal proceeding before the IJ.

## X

In construing § 1321(a)(6) not to allow indefinite civil detention of aliens, the Supreme Court in *Zadvydas* was careful to state:

> [W]e leave no "unprotected spot in the Nation's armor." Neither do we consider terrorism or other special circumstances where special arguments might be made for forms of preventative detention and for heightened deference to the judgments of the political branches with respect to matters of national security.

121 S.Ct. at 2502 (citation omitted). After the horrific events of September 11, 2001, the Court's statement takes on special significance.

No one contends that Kim is a terrorist. He was brought to the United States from Korea when he was six years old and became a lawful permanent resident alien when he was eight. He committed rather ordinary crimes in the state of California, and those crimes are the basis for the removal proceedings now pending against him.

 No responsible court will leave an "unprotected spot in the Nation's armor," and our decision does not do so. We do not hold that a lawful permanent resident alien in removal proceedings has an absolute right to bail. We hold only that such an alien has a right to an individualized determination of a right to bail, tailored to his or her particular circumstances.

We must remember that our "Nation's armor" includes our Constitution, the central text of our civic faith. It is the foundation of everything that makes our coun-

try's system of laws and freedoms worth defending. As a lawful permanent resident, Kim is entitled to the individualized determination and fair procedures guaranteed by the Due Process Clause of the Fifth Amendment.

Conclusion

We affirm the order of the district court requiring the INS to conduct a bail hearing for Kim. However, our rationale does not go as far as the district court's. We do not hold that § 1226(c) is unconstitutional on its face. Rather, we hold only that it is unconstitutional as applied to Kim in his status as a lawful permanent resident alien. We hold that the INS may detain a lawful permanent resident alien prior to removal proceedings, but that due process requires that it hold a bail hearing with reasonable promptness to determine whether the alien is a flight risk or a danger to the community.

AFFIRMED.