Dhonovan Paul **RAMOS SERRANO,**
Petitioner,

v.

Anne **ESTRADA, District Director
Immigration and Naturalization
Service, et al., Respondents.**

**Ismael Martinez–Mendoza, Petitioner,**

v.

**John Ashcroft, et al., Respondents.**

**Primitivo Molina, Petitioner,**

v.

**John Ashcroft, et al., Respondents.**

Case Nos. 3:01–CV–1916–M, 3:02–CV–
0703–M, 3:02–CV–0722–M.

United States District Court,
N.D. Texas,
Dallas Division.

May 13, 2002.

Javier N. Maldonado, Lawyers Committee for Civ. Rights, Immigrant and Refugee Rights Project, San Antonio, TX, Hussein Sadruddin, Lawyers' Committee for Civ. Rights Under Law of TX, Immigrant and Refugee Rights Project, Dallas, TX, for petitioner.

Joshua Turin, Turin & Turin, Dallas, TX, for Ismael Martinez-Mendoza and Primitivo Molina.

Myrna B. Silen, U.S. Attorney's Office, Dept. of Justice, Dallas, TX, James Thomas Reynolds, Immigration & Naturalization Service, Dept. of Justice, Dallas, TX, for respondents.

## MEMORANDUM OPINION AND ORDER

LYNN, District Judge.

Before the Court are motions in three separate cases raising a single legal question: whether the Immigration and Nationality Act ("INA") § 236(c), codified at 8 U.S.C. § 1226(c)(1), is unconstitutional as applied to permanent resident aliens. After careful consideration of the legal issues presented by Petitioners and Respondents in their briefing and at oral argument, the Court concludes that the statutory provision is unconstitutional. The irrebuttable presumption that permanent resident aliens falling within the ambit of § 236(c) are flight risks and/or a danger to the community does not comport with substantive due process guarantees of the Fifth Amendment to the United States Constitution.

### FACTUAL PREDICATE.

The three petitioners in these cases are Dhonovan Paul Ramos Serrano ("Serrano"), Ismael Martinez–Mendoza ("Mendoza"), and Primitivo Molina ("Molina"). Each was detained pursuant to § 236(c). A brief recounting of the underlying facts of each case follows:

*(1) Serrano*

Serrano, a citizen of the Philippines, entered the United States in 1990 as a visitor and gained permanent resident alien status on August 13, 1992. On April 30, 1998, he was sentenced to 46 months in federal prison for conspiracy to commit bank fraud and receipt of stolen money. On June 30, 1999, based on the federal conviction, the Immigration and Naturalization Service ("INS") initiated removal proceedings and served petitioner with a Notice to Appear, alleging deportability under the INA. On December 22, 2000, after serving 40 months of his 46–month sentence, Serrano was released from federal prison and transferred to Harris County, Texas, to answer to outstanding fraudulent check charges. At some point, Serrano was released by state authorities and remained at large for several months, during which period he lived in Arizona, returning to Dallas three times to attend scheduled deportation hearings, the first two of which were rescheduled. On June 5, 2001, Serrano appeared before an Immigration Judge, who informed Serrano that he should never have been released from custody. He was given three days to make arrangements to return to Dallas to surrender to INS custody. He did so on June 8, 2001. A removal hearing was held, and a removal order issued on September 25, 2001.[1] Serrano's appeal of the removal order is currently pending with the Board of Immigration Appeals. He has been in continuous custody since June 8, 2001. Because § 236(c) does not provide for it, Serrano has not appeared before an Immigration Judge for a determination of whether he should be released on bond pending issuance of a final order. Serrano's complaint about the government's failure to grant him an individualized bond determination was referred to Magistrate Judge Jeff Kaplan for Findings and a Recommendation. On March 6, 2002, Judge Kaplan made such Findings and a Recommendation, concluding that "the mandatory no-bail civil detention provisions of section 236(c) violate due process and are unconstitutional as applied to lawful permanent resident aliens."[2] The INS objected to the Findings and Recommendation. The Court has reviewed the United States Magistrate Judge's determinations under a *de novo* standard of review.[3]

*(2) Molina*

Molina, a citizen of Mexico, attained permanent resident alien status in the United States on December 5, 1990. On November 4, 1997, he pled guilty to misdemeanor assault and received deferred adjudication and twelve months probation, which he successfully completed. On August 9, 2001, he again pled guilty to misdemeanor assault and received a one-year probated sentence.[4] Based on these criminal of-

1. This order does not constitute a final order. To be final, an administrative order of removal is either: (1) entered by an Immigration Judge without granting voluntary departure or other relief, where the alien waives the right of appeal; or (2) the Board of Immigration Appeals (BIA) enters an order of deportation, without granting voluntary departure or other relief, or the period for seeking BIA review must have expired. 8 U.S.C. § 1101(a)(47)(B). *Kim v. Ziglar*, 276 F.3d 523, 528 (9th Cir.2002).

2. *Serrano v. Estrada*, No. 3–01–CV–1916, 2002 WL 485699, * 4 (N.D.Tex. March 6, 2002).

3. *See Lady v. Neal Glaser Marine, Inc.*, 228 F.3d 598, 601 (5th Cir.2000); *Baker v. Farmers Elec. Coop., Inc.*, 34 F.3d 274, 278 (5th Cir.1994).

4. Both convictions arose after police were dispatched to Molina's home following assaults by him upon his wife.

fenses, Molina was taken into INS custody on March 7, 2002. Following a bond determination, the Immigration Judge released him on a $1,500.00 bond. Neither Molina nor the INS appealed this determination. Bond was posted and Molina was released that day. On March 25, 2002, Molina was re-arrested, due to the INS additionally charging petitioner as an "aggravated felon," thus triggering the no-bail provision of the INA.[5] At a bond re-determination hearing held on March 27, 2002, the Immigration Judge held that Molina was statutorily barred from an individualized bond determination, and ordered him detained. Molina has been in continuous custody since.

*(3) Martinez–Mendoza*

Mendoza, a citizen of Mexico, attained permanent resident alien status on August 29, 1991. On October 9, 2001, he pled guilty to unlawfully carrying a weapon in a tavern under § 46.02 of the Texas Penal Code. On March 25, 2002, a Notice to Appear was issued, charging Mendoza with being subject to removal pursuant to § 237(a)(2)(C) of the INA,[6] a crime subject to § 236(c). He was taken into custody and has remained in custody since.

## ANALYSIS

While the underlying facts of each case differ, the three cases here considered all necessitate a determination by this Court as to the constitutionality of § 236(c).

### A. Applicable INA Procedures and Provisions

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA");[7] which amended the INA to include § 236(c). It provides, in relevant part, that:

> The Attorney General *shall* take into custody any alien who—
>
> B. is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> C. is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>
> D. is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or
>
> E. is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
>
> when the alien is released, without regard to whether the alien is released on parole, supervised release or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.[8]

Under § 236(c), the Attorney General is thus required to detain a deportable criminal alien following the completion of his prison sentence until a final removal order is issued. The only limited safe harbor from this mandatory detention, inapplicable in any of the cases here, benefits aliens who are participating in, or have an imme-

---

5. Specifically, the Additional Charges of Inadmissability/Deportability notice refers to Molina as "an alien who has been convicted of an aggravated felony, as defined by § 101(a)(43)(F)" of the INA.

6. 8 U.S.C. § 1227(a)(2)(C).

7. 8 U.S.C. § 1101 *et seq.* (1999).

8. 8 U.S.C. § 1226(c)(1) (1999) (emphasis added). Section 236(c) and its mandatory detention directive became effective October 9, 1998.

diate family member participating in, the federal Witness Protection Program.

Section 236(c) targets "criminal aliens." While the INA does not specifically define "criminal alien", "it applies mainly to aliens convicted of 'aggravated felonies' or [to designated offenses] ... involving moral turpitude." [9] The statute further requires that covered offenses be federal, state, or foreign law violations for which the term of imprisonment was completed within the previous fifteen years. In each case before the Court, § 236(c) and its mandatory detention provision applied because the permanent resident aliens pled guilty to "aggravated felonies," within the meaning of the INA, or, in the case of Mendoza, pled guilty to a firearms offense, a listed offense under § 236(c).[10] An "aggravated felony" is broadly defined under 8 U.S.C. § 1101(a)(43), to include, among other things, crimes of violence, and offenses related to theft and fraud. The crimes committed by Serrano, Molina, and Mendoza all trigger mandatory detention under § 236(c).

## B. The Recognition of a Liberty Interest

Whether the mandatory detention provision is unconstitutional as applied to the permanent resident aliens before the

Court turns, in part, on the identification of a liberty interest.[11] The Due Process Clause of the Fifth Amendment states that, "No person shall ... be deprived of life, liberty, or property without due process of law." [12] As the Supreme Court has held, "[i]t is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." [13]

Respondents argue that the petitioners are entitled to diminished due process protections because they do not possess a fundamental liberty interest. As alluded to in oral argument, they essentially contend that these petitioners have been stripped of their constitutional protections by having committed criminal acts. In doing so, they place great reliance on the Seventh Circuit's opinion in *Parra v. Perryman.*[14] However, the *Parra* analysis has been rejected in a number of more recent cases, and this Court declines to follow *Parra.* For the reasons stated below, the cases before the Court mandate application of liberty principles.

In *Parra v. Perryman,* the petitioner had been convicted of aggravated criminal sexual assault, an aggravated felony requiring removal under the INA and thus invoking mandatory detention pursuant to section 236(c).[15] Judge Easterbrook, writ-

---

9. S. REP. No. 104–48, 104th Cong., 1st Sess. (1995) at 4.

10. At the hearing in this matter, the government stated that the issue of whether Mendoza falls within the definition of an "aggravated felon" will be determined by an Immigration Judge on May 24, 2002. This contention does not alter the Court's analysis given that the offense referenced in the Notice for Mendoza to Appear triggered § 236(c), even if it is not an aggravated felony. For purposes of this opinion, since the government is treating Molina as a "criminal alien" subject to the mandatory detention mandate of § 236(c), the Court will regard him as such.

11. *See Hoang v. Comfort,* 282 F.3d 1247, 1255 (10th Cir.2002) ("[t]he first step in any due process analysis is a careful identification of the asserted right.") (citing *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)).

12. U.S. Const. amend. V.

13. *Reno v. Flores,* 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

14. 172 F.3d 954, 955 (7th Cir.1999).

15. 172 F.3d 954, 955 (7th Cir.1999). Of note, while several district court cases within the Seventh Circuit have addressed the constitu-

ing for the panel, held that mandatory detention did not infringe the petitioner's due process rights because his interest was "not liberty in the abstract, but liberty in the United States by someone no longer entitled to remain in this country." [16] In doing so, the court concluded that "[a] criminal alien who insists on postponing the inevitable has no constitutional right to remain at large during the ensuing delay." [17]

Post-*Parra*, three circuit courts have held that the mandatory detention of lawful permanent resident aliens without individualized bond hearings violates the alien's due process interests. [18] The unwillingness of the circuit courts to accept the *Parra* court's reasoning rests on a rejection of *Parra's* holding that criminal aliens within the grasp of § 236(c) have extremely diminished liberty interests. Rather, the Third, Ninth, and Tenth Circuits have held that a permanent resident alien convicted of an aggravated felony does not forfeit his due process rights such that only a diminished liberty interest should be recognized.

The most recent pronouncement by a circuit court is the Tenth Circuit opinion's in *Hoang v. Comfort*. [19] In *Hoang*, three petitioners, all lawful permanent residents who entered the United States as refugees from Vietnam, challenged the constitution-

ality of § 236(c). Petitioner Nguyen pled guilty to the misdemeanor offense of threat/use of a dangerous weapon in a fight and was sentenced to 365 days in jail, with 320 days suspended. Petitioner Hoang pled guilty to two counts of aggravated robbery by use of force, threats, and intimidation, and with the aid of a firearm, and was sentenced to two consecutive ten-year terms. Petitioner Trung pled guilty in Utah state court to two counts of forgery, and was sentenced to an indeterminate term, not to exceed five years. He was required to serve thirty days. In each case, the district court, in response to the petitioners' writs of habeas corpus and requests for injunctive relief, ordered the INS to provide individual bond hearings. In each case, the Immigration Judge released the petitioners on bond.

The Tenth Circuit began its analysis by accepting the conclusion rejected by the court in *Parra* that "[a]liens who are lawful permanent residents of and are physically present in the United States are persons within the protection of the Fifth Amendment, and may not be deprived of life, liberty or property without due process of law." [20] The Tenth Circuit did not make this determination in a vacuum. Instead, it relied on Supreme Court guidance for its conclusion. The *Parra* court's holding is divorced from such precedent.

tionality of § 236(c), some have severely curtailed the reach of *Parra* by limiting it to situations where an alien admits or stipulates, during the pre-deportation proceeding stage, that he or she has no chance of success in the deportation proceeding. *Vang v. Ashcroft*, 149 F.Supp.2d 1027 (N.D.Ill.2001); *Tiv v. Reno*, No. 99 C 872, 2000 WL 246252 (N.D.Ill. Feb 24, 2000); *but see Yanez v. Holder*, 149 F.Supp.2d 485 (N.D.Ill.2001); *Kahn v. Perryman*, No. 00 C 3398, 2000 WL 1053962 (N.D.Ill. Jul 31, 2000).

16. *Parra*, 172 F.3d at 958.

17. *Id.*

18. *See Hoang v. Comfort*, 282 F.3d 1247 (10th Cir.2002); *Kim v. Ziglar*, 276 F.3d 523 (9th Cir.2002); *Patel v. Zemski*, 275 F.3d 299 (3d Cir.2001).

19. 282 F.3d at 1249. Several district courts within the Tenth Circuit have also found § 236(c) unconstitutional: *Gonzalez–Portillo v. Reno*, No. 00–Z–2080, 2000 WL 33191534 (D.Colo. Dec 20, 2000); *Son Vo v. Greene*, 109 F.Supp.2d 1281 (D.Colo.2000); *Martinez v. Greene*, 28 F.Supp.2d 1275 (D.Colo.1998).

20. *Hoang*, 282 F.3d at 1256.

In *Chew v. Colding*, the Supreme Court held that an alien's liberty interest was significant enough that the Constitution required a hearing before deportation, even when removal was all but required:

> [An alien] may not be deprived of his life, liberty or property without due process of law. Although it later may be established . . . that [he] can be expelled and deported, yet before his expulsion, he is entitled to notice of the nature of the charge and a hearing at least before an executive or administrative tribunal. Although Congress may prescribe conditions for his expulsion and deportation, not even Congress may expel him without allowing him a fair opportunity to be heard.[21]

Justice O'Connor, in her concurrence in *Reno v. Flores*,[22] echoed these sentiments by stating that *all* aliens have "a constitutionally protected interest in freedom from institutional confinement. That interest lies within the core of the Due Process Clause, and the [majority does] not hold otherwise."

This position was reaffirmed in *Zadvydas v. Davis*, wherein the Supreme Court noted "that an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether *irrespective of the procedures used*, the Constitution permits detention that is indefinite and potentially permanent."[23] There, the Court addressed the detention provisions that apply to aliens who have already been ordered deported, but for whatever reason, could not be deported within the ninety-day term set by statute.[24] In such situations, special non-mandatory INS provisions authorized further detention of the alien.[25] The statutory provisions gave the Attorney General discretion to detain aliens only if the alien was individually determined "to be a risk to the community or unlikely to comply with the order of removal."[26] The Supreme Court specifically addressed whether the post-removal provisions authorized the Attorney General to detain a removable alien "indefinitely beyond the removal period or only for a period reasonably necessary to secure the alien's removal."[27] As is the case with petitioners here, the Supreme Court dealt with aliens who were legally admitted to the United States but subsequently ordered removed, stating that "[a]liens who have not yet gained initial admission to this country would present a very different question."[28]

The petitioner in *Zadvydas* had a long criminal record, including drug offenses, attempted robbery and burglary, and theft, and had a history of flight.[29] Never-

21. 344 U.S. 590, 596–97, 73 S.Ct. 472, 97 L.Ed. 576 (1953).

22. 507 U.S. 292, 315, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

23. 533 U.S. 678, 696, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (emphasis added).

24. *Id.* at 682, 121 S.Ct. 2491 ("[w]hen an alien has been found to be unlawfully present in the United States and a final order of removal is entered, the Government ordinarily secures the alien's removal during a subsequent 90–day statutory 'removal period,' during which time the alien normally is held in custody").

25. 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V).

26. *Id.*

27. *Id.* at 683.

28. *Id.*

29. The government also had requested that the Supreme Court review *Kim Ho Ma v. Reno*, 208 F.3d 815 (9th Cir.2000), *vacated by Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). There, based on constitutional concerns, the Ninth Circuit concluded that given the absence of a repatriation agreement between the United States and Cambodia, and *the resulting unlikelihood*

theless, the district court held that because the government would likely never succeed in its efforts to deport the petitioner from the United States to Lithuania or his wife's country, the Dominican Republic, his permanent confinement violated the Constitution. The Fifth Circuit reversed, finding that deportation was not "impossible," and that the Government's good faith efforts, coupled with periodic administrative review, saved the situation from constitutional frailty. The Supreme Court took pains to avoid reaching the constitutional issue. Citing principles of constitutional avoidance, it read an express limitation into the statute. It held that detention of resident aliens for up to six months after entry of a final removal order was presumptively reasonable, but that after six months, if an alien could demonstrate that there was good reason to believe that there was no significant likelihood of removal in the reasonably foreseeable future, the government had to rebut the alien's showing in order to continue lawful detention of the alien. The Supreme Court relied on *United States v. Salerno*, discussed below, to hold that the government must demonstrate "special justifications," such as those involving terrorists or especially dangerous individuals, for continued indefinite detention.

*Zadvydas's* holding that aliens awaiting deportation still have a "strong" liberty interest is at odds with *Parra's* holding that aliens awaiting a deportation proceeding, who are *not* yet subject to a final removal order, have diminished liberty interests. However, the *Zadvydas* court expressly distinguished pre-removal detention and post-removal detention: "post-

removal-period detention, *unlike detention pending a determination of removability* or during the subsequent 90–day removal period, has no obvious termination point." [30] While a termination point cannot precisely be identified in pre-removal proceedings, there will no doubt come a time when these petitioners will have a final order of some kind issued against them, either a final order of removal when all appeals are exhausted or an order allowing them to stay in this country. This is a different situation than that of the *Zadvydas* petitioner, who could not foresee a time when he would be removed to Lithuania, a country apparently not willing to accept repatriation of its own national. Nevertheless, *Zadvydas* is applicable in the sense that it recognizes the existence of a fundamental liberty interest for permanent resident aliens. It expressly rejected the government's position that "whatever liberty interest the aliens possess, it is 'greatly diminished' by their lack of a legal right to 'liv[e] at large in this country.'" [31] It stands to reason that if permanent resident aliens who have a final removal order pending against them have "strong" constitutional due process rights, then so should permanent resident aliens who do not yet have a final removal order issued against them. Thus they have a fundamental right to a determination of whether their liberty interests should be impinged during the deportation process. As stated by the Northern District of California, the actual right at issue is the "modest," yet no less fundamental "right to an individualized bond determination regarding whether release pending deportation is appropriate." [32]

---

of a successful deportation, the acceptable time for detention had expired after ninety days. As noted, the Supreme Court vacated the Ninth Circuit's decision.

**30.** 533 U.S. at 697, 121 S.Ct. 2491 (citations omitted).

**31.** *Id.*

**32.** *Danh v. Demore,* 59 F.Supp.2d 994, 1003 (N.D.Cal.1999).

While the Court is not bound by the rulings of other district courts in this Circuit, it notes

## C. Applicable Standard of Review

■ Respondents argue that the rational basis review utilized in *Reno v. Flores*[33] is applicable to these cases. In *Flores*, a class of alien juveniles held in child care facilities while awaiting deportation proceedings challenged a statute pursuant to which they could be released only to a parent, close relative, or legal guardian. Petitioners, who had no parents, close relatives, or legal guardians, asserted their right to be placed in the custody of a responsible and willing adult rather than the government-operated child care facility. In the alternative, they claimed a right to an individualized determination as to whether it was in their best interests to remain in custody or be released to a private custodian.

The Court applied a rational standard of review, and upheld the statute. It reached this conclusion because petitioners were juveniles who, "unlike adults, are always in some form of custody," because "freedom from physical restraint . . . [wa]s not at issue in th[e] case," because the foster-care conditions the juveniles were living under could not be properly characterized as "physical restraint," and because the statute served the purposes of "preserving and promoting the welfare of the child."[34] The interest in "protecting the welfare of [those] juveniles" outweighed the juveniles' interest in being released to "strangers."[35] The decision of the Court in *Flores* so heavily relied upon the juvenile status of the petitioners that it is of marginal relevance to the standard of review applicable to these cases.

In *United States v. Salerno*,[36] the Supreme Court addressed the constitutionality of pretrial detention for arrestees under the Bail Reform Act of 1984, allowing for the detention of an arrestee without bail

---

that two such courts have expressly addressed the issue before this Court, and both rejected constitutional challenges to § 236(c). In *Reyes v. Underdown*, 73 F.Supp.2d 653 (W.D.La.1999), a citizen of Colombia served time in federal prison for conspiracy to possess with intent to distribute heroin and cocaine, and was then taken into and retained in INS custody without a bond determination. He challenged § 236(c) on constitutional grounds. The district court concluded that an alien does *not* have a fundamental right to be free from detention pending his deportation after having been convicted of an "aggravated felony." As stated by the court:

The mandatory detention imposed by INA § 236(c) is limited to aliens who have been convicted of certain enumerated crimes including aggravated felonies and controlled substance violations. By mandating the detention of certain criminal aliens, Congress presumes that such aliens pose a danger to the community and/or pose a flight risk. The presumption is not excessive given the serious nature of the crimes involved.

*Id.* at 657–58. *Reyes* was decided before *Zadvydas*. In the Court's view, the recognition in *Zadvydas* of due process rights of resident aliens, even those bound by a final deporta-

tion removal order, diminishes *Reyes's* worth. Further, nothing in *Reyes* states whether or not the alien petitioner was a permanent resident alien, a status which mattered greatly to the Ninth Circuit in *Kim*, 276 F.3d at 535, and which is critical to this Court's determination here.

In *Okeke v. Pasquarell*, 80 F.Supp.2d 635 (W.D.Tex.2000), three permanent resident aliens were retained in INS custody without a bond determination. They brought a habeas action, contending that § 236(c) was unconstitutional. The court followed the Seventh Circuit's reasoning in *Parra*, rejecting the constitutional challenge. In making its determination, the district court relied on the Fifth Circuit's opinion in *Zadvydas*, 185 F.3d 279, 285–86 (5th Cir.1999), which was thereafter vacated by the Supreme Court.

**33.** 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

**34.** *Id.* at 302–03, 113 S.Ct. 1439.

**35.** *Id.* at 305, 113 S.Ct. 1439.

**36.** 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

pending trial "if the Government demonstrate[d] by clear and convincing evidence after an adversary hearing that no release conditions" would reasonably assure the safety of the community. The Court upheld the constitutionality of the statute after balancing the government's interest in detention against "the individual's strong interest in liberty." [37] The Court concluded that the arrestee's liberty interest could not lawfully be infringed unless the process was narrowly tailored to serve a compelling state interest. [38] In discussing whether post-removal order detention violated the Due Process Clause of the Fifth Amendment, the Court in *Zadvydas* relied on *Salerno:*

> And this Court has said that government detention violates that Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections, or, in *certain special and 'narrow' non-punitive circumstances, where a special justification,* such as harm-threatening mental illness, *outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'* [39]

In *Foucha v. Louisiana,* [40] also relied on by the *Zadvydas* Court, the Supreme Court struck down a Louisiana statute that required the detention of defendants found not guilty by reason of insanity until they could prove they were not dangerous. The Court found the scheme of confinement not "carefully limited," because it was not restricted to any subset of those found insane and did not require the government to prove dangerousness or that the detainee was presently mentally ill. *Foucha's* "carefully limited" language clearly denotes that infringement of a fundamental right must satisfy the application of a heightened level of scrutiny.

In *Patel v. Zemski,* [41] the Third Circuit held that § 236(c) violated the petitioner's substantive due process rights. [42] The petitioner, a 55-year old citizen of India who had received permanent resident alien status in 1990, was convicted of harboring an undocumented alien. While serving his five-month federal prison term, the INS issued a Notice to Appear, charging that his conviction constituted an "aggravated felony" within the meaning of the INA. Immediately upon his release from prison, he was taken into INS custody.

The *Patel* court relied on the Supreme

---

37. *Id.* at 750, 107 S.Ct. 2095.

38. *Id.* at 748, 107 S.Ct. 2095.

39. *Zadvydas,* 533 U.S. at 690, 121 S.Ct. 2491 (quoting *Salerno,* 481 U.S. at 746, 107 S.Ct. 2095, *Foucha,* 504 U.S. at 80, 112 S.Ct. 1780 (emphasis added)).

40. 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992).

41. 275 F.3d 299 (3d Cir.2001). In addition, several district courts within the Third Circuit have found § 236(c) unconstitutional in its application: *U.S. ex rel. Tsitron v. Elwood,* No. 01–CV–4241, 2002 WL 93053 (E.D.Pa. Jan 23, 2002); *Dean v. Ashcroft,* 176 F.Supp.2d 316 (D.N.J.2001); *Koifman v. Zemski,* No. 01–CV–2074, 2001 WL 1167541 (E.D.Pa. Jul 31, 2001); *Sharma v. Ashcroft,* 158 F.Supp.2d

519 (E.D.Pa.2001); *U.S. ex rel. Radoncic v. Zemski,* 121 F.Supp.2d 814 (E.D.Pa.2000); *Juarez–Vasquez v. Holmes,* No. C.A. 00–4727, 2000 WL 1705775 (E.D.Pa.2000); *Koita v. Reno,* 113 F.Supp.2d 737 (M.D.Pa.2000); *Chukwuezi v. Reno,* No. 3:CV–99–2020, 2000 WL 1372883 (M.D.Pa. May 16, 2000); *Bouayad v. Holmes,* 74 F.Supp.2d 471 (E.D.Pa. 1999).

42. On April 4, 2002, the Solicitor General filed a petition for a writ of certiorari seeking review of the judgment of the Third Circuit in a related case, *Radoncic v. Zemski,* No. 01–1074, 2001 WL 1681643 (3d Cir. Jan.4, 2002). That case involves a due process challenge by an *illegal* alien to mandatory detention without an individualized bail determination.

Court's conclusion in *Zadvydas*,[43] that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."[44] In doing so, it held that a heightened standard of review "applied to a lawful permanent resident who still has available avenues for relief from removal."[45] It thus employed the *United States v. Salerno*[46] two-part substantive due process inquiry:

> The test asks first, if the restriction on liberty constitutes impermissible punishment or permissible regulation, and second, whether the statute is excessive in relation to Congress' regulatory goals.[47]

Likewise, because the liberty interest identified by the Tenth Circuit in *Hoang* was determined to be fundamental, the Court found that "the Government may not infringe upon it, regardless of the process provided, unless the infringement is narrowly tailored to serve a compelling state interest."[48] This Court agrees that the right of a permanent resident alien to be free from restraint, unless an individual bond determination mandates otherwise, is fundamental; thus, § 236(c) must be analyzed under a heightened standard of review.[49]

Respondents also contend that because Congress has plenary power in immigration matters, judicial deference must be given to Congressional judgments. However, while the plenary power of Congress in this area is recognized, an outer boundary, within which Congress's implementation of this authority must comport, is likewise evident—that being the United States Constitution. At least in the context of detention of permanent resident aliens whose presence in the United States is undeniably legal, detention with no opportunity for an individualized bond determination must be analyzed under a heightened standard of review.[50]

## D. Application of Heightened Scrutiny Review

■ As in *Zadvydas*, the proceedings here are civil in nature, not criminal. Be-

---

**43.** 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).

**44.** *Patel*, 275 F.3d at 310 (quoting *Zadvydas*, 533 U.S. at 690, 121 S.Ct. 2491).

**45.** *Id.*

**46.** 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

**47.** *Id.* at 746–47, 107 S.Ct. 2095.

**48.** *Hoang*, 282 F.3d at 1258.

**49.** This Court finds persuasive *Danh v. Demore*, 59 F.Supp.2d 994 (N.D.Cal.1999). On the issue of whether heightened scrutiny, rather than a more deferential standard, should apply to the same issue before this Court, it stated that:

> [Section] 236(c) triggers heightened review because it does not reflect a substantive decision over immigration policy, but rather a means for effectuating such a decision.

> Although Congress has broad authority to decide what classes of aliens should be deported, the same is not true of how those aliens are treated pending deportation. Like all rules affecting fundamental rights, rules falling in the latter category must comport with due process. *Salerno* therefore controls.

*Danh*, 59 F.Supp.2d at 999–1000.

**50.** In *Wong Wing v. United States*, 163 U.S. 228, 235, 16 S.Ct. 977, 41 L.Ed. 140 (1896), the Supreme Court held that "[p]roceedings to exclude or expel would be [in] vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation." However, neither party is disputing the ability of the Attorney General to hold permanent resident aliens in custody. Rather, petitioners request only that the statute operate within constitutional parameters by employing an individualized determination of whether the party is a flight risk or a danger to the community.

cause the Court has found that a fundamental right exists, it must determine, under the heightened standard set forth in *Salerno* and *Zadvydas:* (1) whether the infringement of a liberty interest is impermissible punishment or a permissible regulation, and (2) whether it is excessive in relation to the regulatory goal Congress sought to achieve, or, stated another way, whether the purposes espoused for the mandatory detention provision constitute "special justifications" which outweigh the individual's constitutionally protected interest.[51]

The government clearly satisfies the first part of the test. Mandatory detention is regulatory, not punitive, in nature. Congress stated several non-punitive reasons for the mandatory detention provision: (1) protecting the public from potentially dangerous criminal aliens; (2) preventing aliens from absconding during removal proceedings; (3) correcting procedures under which twenty percent of criminal aliens released on bond did not report for deportation hearings; and (4)

restoring public faith in the immigration system.[52] These are all legitimate goals, and there is nothing in the record that demonstrates a design on the part of Congress to "punish" permanent resident aliens. Since the Court finds the statutory provision non-punitive, it moves to the second part of the analysis. Respondents contend that, even if a fundamental right is recognized, Congress has stated "special justifications" for the mandatory detention statute—those being prevention of flight and protection of the community from crime—both of which outweigh the alien's constitutionally protected interest in physical liberty.

Congress enacted the mandatory detention provision in § 236(c) to address practical concerns that "[c]onsiderable taxpayer dollars [we]re being spent policing, adjudicating, confining, and deporting criminal aliens," and that "[o]ver 20 percent of nondetained criminal aliens fail[ed] to appear for deportation proceedings."[53] These reasons, as well as

---

**51.** *Zadvydas,* 533 U.S. at 690, 121 S.Ct. 2491.

**52.** S. Rep. No. 104–48, 104th Cong., 1st Sess. (1995) at 23–27, 31–32.

**53.** *Id.* at 2, 9, 13, 22. On this point, Respondents in *Serrano* also argue that Magistrate Judge Kaplan erred in following the Ninth Circuit's decision in *Kim,* which rejected government statistics, allegedly supporting the conclusion that before the amendments to the INA, eighty-nine percent of undetained criminal aliens fled during deportation proceedings. *Kim v. Ziglar,* 276 F.3d 523 (9th Cir. 2002). Those statistics came from a 1996 report prepared by the Department of Justice, Office of the Inspector General. *See* Inspection Report, *Immigration and Naturalization Service Deportation of Aliens After Final Orders Have Been Issued,* Rep. No. I–96–03 (March 1996), available at http://www.usdoj.gov/oig/i9603/i9603.htm. The government has used this report in cases throughout the country to argue that proper means were employed by Congress. It contends that the report demonstrates that 89% of the "nonde-

tained" aliens subject to a final removal order failed to appear for removal when ordered to do so. *Id.* at 8–9. The *Kim* court disputed this figure, finding the 89% figure "inapplicable to aliens released on bail," *Kim,* 276 F.3d at 532, because the report included aliens released on bail in the "detained" alien group. It arrived at this determination by citing the portion of the report stating that "[w]e reviewed 402 detained alien case files. INS deported 376, or almost 94 percent of all the aliens. The 26 aliens not deported included ... 2 who had been released on bond and then absconded." Report at 6. The Ninth Circuit reasoned that if these two aliens released on bond were included in the "detained" group, then the "nondetained" group could not also include aliens released on bond. Respondents argue that "[t]he undersigned has been advised by the Office of Inspector General ... that the Office in fact counted aliens released on bond during their removal proceedings within the 'nondetained' category. The two aliens cited by the court of appeals [in *Kim* ] were held in INS detention

the prevention of crime, are no doubt compelling. However, the more difficult question is whether, on balance, the mode of operation selected by Congress is **narrowly** tailored such that the governmental interests outweigh the interests of the alien in an individualized bond determination.

As stated, the types of crimes falling within the ambit of § 236(c) are diverse, ranging from crimes of violence to many nonviolent crimes, such as perjury, fraud, and money laundering.[54] Section 236(c) irrebuttably presumes that all detained aliens falling under it possess a purpose to harm society or flee from deportation proceedings. Nevertheless, the Respondents argue that mandatory detention passes constitutional muster:

> when their final orders of deportation were entered and were released on bond only after they could not be timely deported." Government's Resp. in *Serrano* at \*11.

> Even assuming the aliens released on bond were included in the nondetained group, as suggested by the government, the report itself is not particularly helpful to the government. The report does not distinguish between those nondetained aliens released on bond that would fall within § 236(c) and those that would not. In addition, the report indicates that, in many cases, flight was not the reason for aliens failing to report. Instead, reasons included the INS's failure to request the surrender of aliens (for example, the detention and deportation centers tested requested the surrender of aliens in only 372 of the 656 cases studied), failure to obtain the aliens's current addresses, and failure of district courts to timely forward final orders. Moreover, citing a "shortage of investigative resources" the report noted that "[n]ondetained aliens who do not comply with a surrender request [we]re rarely pursued actively." Report at 16. The report thus reveals target areas, perhaps less intrusive than mandatory detention, to meet the compelling interests of the government. Further, the Court finds persuasive the statements of the Third Circuit in *Patel v. Zemski:*

> > The government cites a study, the conclusions of which Patel and the amici vigor-

Those aliens [subject to § 236(c)'s mandatory no-bail provision] have been convicted of particular crimes that Congress specifically enumerated, and they have enjoyed full due process protections in connection with those convictions. Thus, criminal aliens have already been accorded the opportunity for an individualized hearing on the essential predicate for their detention under Section 1226(c).[55]

These sentiments were reiterated during oral argument, when counsel for Respondents argued that individualized detention hearings for petitioners *were* conducted when the Immigration Judge determined that each Petitioner fell within § 236(c)'s mandatory no-bail provision. The Court

> ously contest, finding that prior to the enactment of this statute ninety percent of criminal aliens not detained during proceedings fled. In fact, a report from the Senate Committee on Government Affairs placed the percentage of aliens who failed to surrender at twenty percent. However, even if the ninety percent figure were correct, § 236(c) requires the imprisonment of the ten percent of aliens who would dutifully report to proceedings. To deprive these individuals of their fundamental right to freedom furthers no government goal, while generating a considerable cost to the government, the alien, and the alien's family. The goals articulated by the government—to prevent aliens from absconding or endangering the community—only justify detention of those individuals who present such a risk.

> 275 F.3d at 311–12 (citation and footnotes omitted). This Court need not now resolve the dispute as to the validity of the report's statistics, since even if most non-detained persons fled before § 236(c) was enacted, the group like the 11% who did not flee—and presumably would not flee if they were released after a bond determination—are entitled to present proof that they would not.

**54.** 8 U.S.C. § 1101(a)(43) (2000).

**55.** Gov't's Resp. in *Molina* at 7–8.

rejects this argument. The determination that an alien has committed an offense which triggers the application of § 236(c) is a necessary precursor to the irrebuttable presumption of mandatory detention under § 236(c), but it does not satisfy the heightened scrutiny which the Fifth Amendment requires for mandatory detention before a final order issues.

Respondents further rely on *Carlson v. Landon,*[56] to demonstrate that the method selected by Congress to carry out its goals is narrowly tailored. The *Carlson* Court upheld a law calling for the detention of alien Communists. While the statute was found to be facially constitutional, its assistance to the government here is limited. Unlike § 236(c), the law did not mandate blanket detention; instead, it utilized a *rebuttable* presumption test, giving discretionary authority to the Attorney General to authorize release in individual circumstances, such as where the individual demonstrated that he was sufficiently absorbed into community life and not a threat to the government. Further, the Court in *Carlson* emphasized that any "purpose to injure could not be imputed generally to all aliens subject to deportation, so discretion was placed by the [Act] in the Attorney General to detain aliens without bail."[57] Such language expressly rejects the statutory scheme present here, since the likelihood of flight or danger to the community is imputed to *all* aliens without an individualized assessment.

In *Kim v. Ziglar,*[58] the case principally relied on by Magistrate Judge Kaplan in *Serrano,* the Ninth Circuit held that the mandatory, no-bail provision of the INA violated an alien's due process right to an individualized bail determination.[59] Petitioner was a citizen of Korea, who became a permanent resident alien of the United States in 1986. In 1996, he was convicted of first degree burglary under the California Penal Code, and, in 1997, he was convicted of "petty theft with priors." While he was serving his state sentence, the INS charged him as an "aggravated felon" under the INA. The day after petitioner was released from prison, he was taken into INS custody, and pursuant to § 236(c), detained with no individualized bond determination.

The district court found § 236(c) facially invalid. The Ninth Circuit, however, determined that "the government ha[d] not provided a 'special justification' for no-bail detention sufficient to overcome a lawful permanent resident alien's liberty interest in an individualized determination of flight risk and dangerousness."[60] It then found that § 236(c) was not narrow enough to survive constitutional scrutiny because

---

**56.** 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952).

**57.** *Id.* at 538, 72 S.Ct. 525.

**58.** 276 F.3d 523 (9th Cir.2002), *petition for cert. filed* (U.S. April 9, 2002) (No. 01–1491). In addition, several district court cases within the Ninth Circuit have likewise found § 236(c) unconstitutional: *Luu v. Demore,* No. C011130MMC, 2001 WL 1006787 (N.D.Cal. Aug 23, 2001); *Perez v. Demore,* No. C 00–4628 CRB, 2001 WL 1042133 (N.D.Cal. Aug 21, 2001); *Lezcano v. Reno,* No. C 99–4894 MJJ, 2000 WL 1175564 (N.D.Cal. Aug 04, 2000); *Szeto v. Reno,* No. C 00–0531 CRB,

2000 WL 630869 (N.D.Cal. May 05, 2000); *Sierra–Tapia v. Reno,* No. 99–CV–986 TW(RBB), 1999 WL 803898 (S.D.Cal. Sep 30, 1999); *Alikhani v. Fasano,* 70 F.Supp.2d 1124 (S.D.Cal.1999); *Danh v. Demore,* 59 F.Supp.2d 994 (N.D.Cal.1999); *Van Eeton v. Beebe,* 49 F.Supp.2d 1186 (D.Or.1999); *Diaz–Zaldierna v. Fasano,* 43 F.Supp.2d 1114 (S.D.Cal.1999).

**59.** The Solicitor General filed a petition for writ of certiorari in *Kim v. Ziglar* on April 9, 2002.

**60.** *Kim,* 276 F.3d at 535.

"[the government] failed to demonstrate that the fact that some aliens may be dangerous [or a flight risk] justifies civil detention, without bail, of all lawful permanent resident aliens who have been charged with removability." [61]

The Court finds the reasoning in *Kim* persuasive. The broad sweep with which the statutory provision reaches disallows the elimination of those individuals who will not harm the public nor abscond prior to deportation, and it is unnecessarily broad if its purpose is to avoid diminishing public faith in the immigration system. In *Patel v. Zemski,* the petitioner had been legally in the United States for seventeen years and had a family as well as a business in the United States. His offense was employing an illegal alien, for which he was sentenced to a five-month prison term. Those facts alone raise a question as to the validity of the presumption that those subject to § 236(c) are necessarily dangerous or flight risks. The absence of an individualized determination of flight risk and dangerousness to the community prevents this Court from identifying a narrow fit between Congress's end goals and the means utilized to accomplish them. Although the government has a compelling interest or "special justification" for ensuring that deportable permanent resident aliens appear for their deportation proceedings and do not constitute a danger to the community, these interests are not sufficient to justify mandatory detention of all permanent resident aliens pending finalization of the process to deport them. The constitutionally protected liberty interest of the petitioners outweighs the government's proffered justifications for the statutory scheme. As stated by the *Hoang* court, although the governmental interests are compelling, the means to further those interests are not narrowly tailored:

> Certainly, the government has a compelling interest in ensuring attendance by deportable aliens at deportation proceedings. However, § 236(c) is not narrowly tailored to achieve that interest. Rather than establishing a procedure to determine which aliens might be flight risks, it establishes an irrebuttable presumption that all aliens to which mandatory detention applies are flight risks.
>
> . . .
>
> [Further,] while it cannot be denied that the government has a compelling interest in protecting the public from dangerous aliens, § 236(c) applies the blanket irrebuttable presumption that all those to whom it applies are dangerous, a presumption not justified by the nature of offenses which § 236(c) encompasses. Offenses to which the mandatory detention provision applies include not only dangerous offenses such as murders, rapes, crimes of terrorist activity, violations of the controlled substances and firearms laws, and crimes committed by repeat offenders, but also less dangerous offenses such as crimes of moral turpitude with a sentence of one year in prison, theft offenses with a term of imprisonment of one year or more, fraud, tax evasion, assisting document fraud in some cases, and perjury.[62]

The means selected by Congress to effectuate its goals are simply not narrowly tailored in § 236(c).

## E. Constitutional Avoidance Principles

As discussed above, the Supreme Court took pains to avoid reaching the constitutional issue lurking in *Zadvydas.*[63] In his

---

**61.** *Id.* at 534.

**62.** *Hoang,* 282 F.3d at 1256.

**63.** 533 U.S. at 689, 121 S.Ct. 2491 ("We have read significant limitations into other immigration statutes in order to avoid their consti-

dissenting opinion, Justice Kennedy criticized the majority's application of the doctrine of constitutional avoidance:

> The Court, it is submitted, misunderstands the principle of constitutional avoidance which it seeks to invoke. The majority gives a brief bow to the rule that courts must respect the intention of Congress, but then waltzes away from any analysis of the language, structure, or purpose of the statute. Its analysis is not consistent with our precedents explaining the limits of the constitutional doubt rule. The rule allows courts to choose among constructions which are 'fairly possible,' not to 'press statutory construction to the point of disingenuous evasion even to avoid a constitutional question.'[64]

Nevertheless, the majority purported to apply the doctrine to establish a presumption that more than six-months detention after a final order is presumptively unreasonable, but to allow the government to prove otherwise until it becomes reasonably clear that it cannot accomplish the deportation it seeks to effectuate.

In the aftermath of *Zadvydas*, both the Ninth and Tenth Circuits unsuccessfully attempted to limit the construction of § 236(c). As stated by the Tenth Circuit in *Hoang*:

> The petitioners contend that such an alternative interpretation is possible if we were to construe the term 'is deportable' in § 236(c) to mean 'subject to a

final order of removal.' Under this interpretation, § 236(c) would only impose mandatory detention on those aliens who had received a final order of removal. However, it is clear from the text of the statute that Congress intended the 'is deportable' language of § 236(c) to apply prior to a final order of removal. Given this clear intention of Congress, we may not adopt a saving construction that is plainly contrary to this intent.

This Court likewise finds unavailable a "saving construction" which could allow this Court to avoid reaching the constitutional question analyzed above. The mandatory provisions at issue cannot legitimately be restricted to allow for a narrowed interpretation. However, this Court rules only on the constitutionality of § 236(c) as applied to the status of permanent resident aliens, rather than addressing, as the petitioners request, whether the statute is facially unconstitutional.[65]

## CONCLUSION

For the foregoing reasons, this Court grants the petition for writ of habeas corpus as to petitioners Mendoza and Molina and orders the Attorney General to schedule bond hearings for each of them so an Immigration Judge may, on or before May 28, 2002, determine whether each of these petitioners represents a flight risk or a danger to the community. The mandatory no-bail provision of § 236(c), as applied to

tutional invalidation. For similar reasons, we read an implicit limitation into the statute before us."). *See also United States v. Witkovich*, 353 U.S. 194, 195, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957) (construing a grant of authority to the Attorney General to ask aliens questions he "deem[s] fit and proper" as limited to questions "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue.").

**64.** *Zadvydas*, 533 U.S. at 707, 121 S.Ct. 2491 (citations omitted).

**65.** "A facial challenge to a legislative act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

permanent resident aliens, violates the substantive due process rights of the petitioners.

As to petitioner Serrano, after a *de novo* review, the Court accepts the United States Magistrate Judge's Findings and Recommendation, entered March 6, 2002, and orders that, on or before May 20, 2002, he be given the same type of individualized bond determination described above for petitioners Mendoza and Molina.

**SO ORDERED.**