Errol L. HALL, Plaintiff,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE (INS), Steven Farqu-
harson, District Director, and Warden
Cudworth, Aci, Cranston, Defendants.

No. 02–103S.

United States District Court,
D. Rhode Island.

March 25, 2003.

David Alan Schechter, Esq., Providence,
RI, for Plaintiff.

Robin E. Feder, Esq., Providence, RI,
for defendants.

### DECISION AND ORDER

Smith, District Judge.

I. *Introduction*

This case is before the Court on Peti-
tioner Errol L. Hall's ("Hall") objection to
a Report and Recommendation issued by
Magistrate Judge David L. Martin. Hall,
currently in the custody of the Immigra-
tion & Naturalization Service ("INS"),[1]
filed an Emergency Motion for Immediate
Release from Mandatory Detention or in
the Alternative an Individualized Bond
Hearing (the "Petition"). In that Petition,
Hall claimed that his mandatory detention
by the INS under § 236(c) of the Immigra-

---

1. Prior to the issuance of this Order, the INS
became known as the Bureau of Citizenship
and Immigration Services, a division of the
newly created Department of Homeland Se-
curity, pursuant to The Homeland Security

Act of 2002, P.L. 107–296, § 471, 116 Stat.
2135, 2205 (2002). For ease of reference,
this Decision will refer to the agency as the
INS.

tion and Nationality Act ("INA"), 8 U.S.C. § 1226(c), violates the Due Process Clause of the Fifth Amendment to the United States Constitution. Magistrate Judge Martin correctly treated the Petition as one for habeas relief pursuant to 28 U.S.C. § 2241.

The INS filed a motion to dismiss Hall's Petition, and after a full hearing on the merits, Magistrate Judge Martin recommended the dismissal of Hall's Petition. For the reasons that follow, this Court adopts and incorporates the detailed facts and travel of the case as set forth by Magistrate Judge Martin in the Report and Recommendation. However, this Court declines to adopt Magistrate Judge Martin's Report and Recommendation insofar as it holds that § 236(c) of the INA does not violate Hall's right to due process afforded to him under the Fifth Amendment. Rather, this Court holds that Hall's right to due process under the Fifth Amendment has been violated by his mandatory detention under § 236(c) without an individualized pre-detention hearing.

## II. Background[2]

Petitioner is fifty-one years of age and a native of Jamaica. He left Jamaica at a young age and lived in the United Kingdom for approximately fourteen years before coming to the United States in 1973. He was admitted to the United States on or about April 14, 1973, on a temporary tourist visa and remained here after the expiration of that visa in December 1973.

On April 15, 1983, after pleading guilty, Petitioner was convicted of armed robbery in the Commonwealth of Massachusetts and received a reformatory sentence of twenty years. He served approximately two years of that sentence in prison and state pre-release programs and the balance on parole. In or around November 1995, while on parole, Petitioner began working at an escort service answering phones. In 1997 he was charged with violating his parole but subsequently began cooperating with law enforcement authorities in a criminal investigation of the escort service. On November 5, 1997, Petitioner was convicted of two offenses: accessory before the fact and deriving support from prostitution.[3] Petitioner was sentenced to two years on this conviction.

While Petitioner was serving this sentence, the INS issued a Notice to Appear charging him as being removable based upon the overstay of his 1973 visa and his 1983 conviction.[4] Petitioner was taken into INS custody on May 5, 1999, upon completion of his two-year sentence.

On March 3, 1999, an immigration judge found that Petitioner was deportable (1) as an alien who overstayed his temporary period of admission since 1973; and (2) in light of his conviction for an aggravated felony (armed robbery) in 1983. *See* 8 U.S.C.A. §§ 1227(a)(1)(B) and (a)(2)(A)(iii)

---

2. The following recitation of the facts of this case is taken substantially from the comprehensive Report and Recommendation issued by Magistrate Judge Martin. Record citations, contained in the Magistrate Judge's Report and Recommendation, are omitted in this review of the background facts.

3. The criminal docket indicates that Petitioner was indicted for seven offenses. He ultimately pled guilty to four offenses, two of which resulted in the imposition of a sentence and two of which were "filed" on his plea of guilty. A fifth offense was "filed" without a change of plea, and the remaining two offenses were "nolle prosequi."

4. Petitioner alleges that his mother filed an "alien relative petition" on his behalf on November 4, 1998; that this "petition was approved on November 1, 1999, conferring a priority date of December 2, 1998," and that as a result, Petitioner may be eligible for an adjustment of status and/or other relief.

(1999).[5] That decision was appealed to the Board of Immigration Appeals ("BIA"), where it was affirmed on August 20, 1999. *See id.* The First Circuit denied Petitioner's application for direct judicial review on January 9, 2001, without prejudice to filing a petition in the district court pursuant to 28 U.S.C. § 2241.[6]

Hall filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 in the United States District Court for the District of Massachusetts, which petition was transferred to this Court on February 21, 2001. On April 27, 2001, this Court (Torres, C.J.) dismissed that action after finding that neither the immigration judge nor the BIA had erred in denying Hall additional continuances to obtain a visa before determining Hall to be removable. Hall again appealed to the First Circuit. During the pendency of that appeal, the BIA reopened Petitioner's removal proceedings and remanded the matter to the immigration judge for further proceedings and a new decision, presumably on his application for waiver of removal.[7] Consequently, the First Circuit on December 11, 2001, remanded the case to the district court with directions to dismiss the case as moot.[8] This Court issued such a dismissal on February 27, 2002.

On the same date, Hall commenced the instant proceeding, seeking his immediate release from detention or, in the alternative, an individualized bail hearing to consider his conditional release pending completion of his re-opened removal proceedings. The Petition also includes claims seeking (1) the return of Petitioner's legal and personal documents, and (2) damages for physical and emotional abuse and injuries sustained as a result of his frequent transfers among prison institutions.[9]

Petitioner alleges that he has been in INS custody since May 5, 1999, and has been in custody continuously since that date. The record shows that while in INS custody, Petitioner has received two INS administrative custody determinations. Both determinations indicated that Petitioner should be detained in INS custody pending a final determination of his removal.

On March 6, 2002, the Court (Torres, C.J.) ordered the INS to file a response to the Petition by March 22, 2002. The INS filed a motion to enlarge the time for filing its response, which motion was granted. On May 21, 2002, Respondents filed their Motion to Dismiss and accompanying memorandum and exhibits. On July 1, 2002, Chief Judge Torres appoint-

---

5. In his papers, Petitioner cites to Sections 237(a)(1)(B) and 237(a)(2)(A)(iii) of the Immigration and Nationality Act (INA). These sections are codified at 8 U.S.C. §§ 1227(a)(1)(B) and (a)(2)(A)(iii).

6. The First Circuit judgment dismissing the appeal also denied Petitioner's motion requesting an order compelling the INS to release his legal documents, without prejudice to renewal in the district court.

7. Petitioner appeared before an immigration judge on December 5, 2002, apparently in connection with his request for an adjustment of status (which if granted would correct his illegal status resulting from overstaying his

1973 visitor's visa) and his request for a waiver of his criminal conviction under Section 212(h) of the INA, 8 U.S.C. § 1182(h)(1)(B). He is still awaiting a decision on that request.

8. In its order the First Circuit stated in pertinent part: "As a result [of the reopening of removal proceedings], the removal order, which was the subject of Petitioner's motion for stay/ § 2241 petition, is no longer in effect and Petitioner is not presently subject to immediate removal."

9. These claims may not properly be brought in a habeas corpus petition. These claims will be dismissed without prejudice.

ed counsel to represent Petitioner in the present proceeding. Petitioner's counsel filed a memorandum opposing the Motion To Dismiss on September 25, 2002, and on September 26, 2002, a hearing was held. Following the hearing, Judge Torres transferred the Petition to the docket of Judge William E. Smith. On November 15, 2002, Magistrate Judge Martin issued his Report and Recommendation recommending the dismissal of Hall's Petition. Hall objected to the Report and Recommendation, and on January 24, 2003, this Court held a hearing on the objection.

### III. *Analysis*

#### A. *Standard of Review*

A motion for habeas relief may be referred to a magistrate judge for initial findings and recommendations. 28 U.S.C. § 636(b)(1)(B); D.R.I. Local R. 32. Determinations made by magistrate judges on dispositive pretrial motions and prisoner petitions are reviewed *de novo* by the district court. *See* Fed.R.Civ.P. 72(b). In making a *de novo* determination, the district court "may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with further instructions." *Id.* In reviewing a magistrate judge's recommendations, the district court must actually review and weigh the evidence presented to the magistrate judge, and not merely rely on the magistrate judge's report and recommendation. *See United States v. Raddatz,* 447 U.S. 667, 675–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).

#### B. *The Statutory Basis for Detention*

The INS detained Hall pursuant to INA § 236(c), codified at 8 U.S.C. § 1226(c), a provision passed as part of the Illegal Immigration Reform and Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009. Section 236(c) requires the mandatory, pre-removal detention of criminal aliens. The provision directs, in pertinent part, that:

> The Attorney General shall take into custody any alien who—
>
> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>
> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been [sentenced] to a term of imprisonment of at least 1 year, or
>
> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
>
> when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1). Therefore, under § 236(c), the Attorney General, by way of the INS, is required to detain "deportable" criminal aliens following the completion of their term of incarceration under prior sentences. The INS is required to detain such individuals until a decision on their removal from the United States is final. As long as the alien fits the definition contained in the statute, the INS only has discretion to release him or her if the individual or an immediate family member is participating in the Witness Protection Program and the alien can convince the INS that the release would pose no danger to the safety of other persons or property. 8 U.S.C. § 1226(c)(2).

Mandatory detention in these cases applies to both lawfully and unlawfully admitted aliens with criminal convictions. During the period of detention, regardless of its duration, a detainee is not allowed a bail hearing. It is this lack of a bail hearing that provides the basis for Hall's Petition in this case.

### C. The Constitutional Framework Regarding Limitations on Immigration Detention

#### 1. General Principles of Due Process in Immigration Matters

Removal of aliens and legal permanent residents ("LPRs") is a power inherent in every sovereign country. *See Mathews v. Diaz,* 426 U.S. 67, 80–81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Chae Chan Ping v. U.S.,* 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). The authority of the United States Congress to regulate the admission of aliens to this country is plenary. *See Gisbert v. U.S. Attorney Gen.,* 988 F.2d 1437, 1440 (5th Cir.1993); *see also* U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power ... To establish an uniform Rule of Naturalization...."). As a result, judicial review of such decisions must be restrained. *See Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Hermanowski v. Farquharson,* 39 F.Supp.2d 148, 156 (D.R.I.1999). The plenary authority of Congress may be delegated in part to the Executive branch. *U.S. ex. rel. Knauff v. Shaughnessy,* 338 U.S. 537, 543, 70 S.Ct. 309, 312–313, 94 L.Ed. 317 (1950). In general, the Supreme Court has been reluctant to extend judicial review to decisions of the Executive branch with respect to immigration matters, and treats Executive branch decisions pertaining to deportation with extraordinary deference. *Carlson v. Landon,* 342 U.S. 524, 534, 72 S.Ct. 525, 531, 96 L.Ed. 547 (1952) ("[A]s aliens fail to obtain and maintain citizenship by naturalization, they remain subject to the plenary power of Congress to expel them under the sovereign right to determine what noncitizens shall be permitted to remain within our borders.")(footnote omitted).

Nonetheless, the ability of the Executive branch to create rules regarding deportation, including rules mandating the detention of aliens pending deportation, is not without constitutional limits. The power to restrain, like most powers of government, is "subject to the counter-weight of due process." *Hermanowski,* 39 F.Supp.2d at 156. In the recent case of *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the United States Supreme Court confirmed the general rule that the Due Process Clause "applies to all persons within the United States, *including aliens,* whether their presence here is lawful, unlawful, temporary, or permanent." 533 U.S. at 693, 121 S.Ct. 2491 (citing *Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)) (emphasis added). The Due Process Clause of the Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V.

The right of due process protected by the Fifth Amendment consists of substantive and procedural components. Substantive due process prohibits the government from engaging in conduct that interferes with rights "implicit in the concept of ordered liberty." *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Government action that deprives an individual of life, liberty, or property, but which survives substantive due process scrutiny, must nevertheless be implemented fairly. This requirement of fairness in implementation has

been traditionally referred to as "procedural" due process. *Id.*

### 2. *The Rights of Aliens to Due Process*

■ Examination of Hall's due process claim begins with a review of the scope of the due process rights to which he is entitled. As an alien, Hall does not receive the full panoply of Constitutional protections and rights afforded to American citizens. *Reno v. Flores,* 507 U.S. 292, 305–06, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).[10] The degree to which an alien is entitled to protections and afforded rights by the Constitution is dependent on the particular classification of the alien. *Johnson v. Eisentrager,* 339 U.S. 763, 770, 70 S.Ct. 936, 94 L.Ed. 1255 ("The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society").[11]

At the low end of this "ascending scale of rights" are excludable aliens. "Excludable" aliens are those who seek admission to this country, but have not secured it. Aliens who fall into this category are not afforded any due process rights, unless Congress chooses to grant them. *Id.; Knauff,* 338 U.S. at 544, 70 S.Ct. 309 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.").

On the high end of this scale are those aliens who have attained LPR status. While these individuals do not enjoy all the rights of citizens, their status entitles them to greater protection than other aliens.

*See, e.g., Landon v. Plasencia,* 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (holding that LPRs are entitled to full procedural due process at the border, even when returning to the United States); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (holding that LPRs are entitled to the protection of the equal protection clause).

On this ascending scale, deportable aliens fall somewhere between excludable aliens and LPRs. Deportable aliens are those who have been ordered deported after having gained admission to the United States. The Supreme Court has made clear that deportable aliens are afforded greater substantive rights than excludable aliens, *Zadvydas,* 533 U.S. at 693, 121 S.Ct. 2491, and that among the substantive rights to which deportable aliens are entitled is the protection of the Due Process Clause of the Fifth Amendment. *See Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896); *Zadvydas,* 533 U.S. at 694, 121 S:Ct. 2491. Here, Hall is clearly a deportable alien who is entitled to some degree of protection under the Fifth Amendment's Due Process Clause. The nature and extent of his entitlement will determine whether his challenge to § 236(c) has merit.

### 3. *Hall's Substantive and Procedural Due Process Challenges*

Hall contends that his mandatory detention under INA § 236(c), without an individualized bail hearing, violates his substantive and procedural due process

---

**10.** The Constitution clearly provides that some rights are afforded exclusively to citizens. For example, Section 1 of the Fourteenth Amendment, the Privileges and Immunities Clause, provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of *citizens* of the United States." (emphasis added).

**11.** An informative and detailed discussion of the sliding scale of rights afforded to aliens, depending on their status, is contained in David A. Martin, *Graduated Application of Constitutional Protections for Aliens: The Real Holding of Zadvydas v. Davis,* 2001 Sup.Ct. Rev. 47 (2001).

rights. Generally, there are two types of due process challenges to federal legislation: "facial" challenges and "as applied" challenges. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *Salerno,* 481 U.S. at 745, 107 S.Ct. 2095. In other words, to assert a facial challenge to § 236(c) successfully, Hall would be required to show that § 236(c) is unconstitutional in all of its applications, regardless of the status and circumstances of the alien. On the other hand, "as applied" challenges pose a less demanding burden and only require that a petitioner demonstrate that the statute, as applied to his or her particular situation, violates due process. *Hoang v. Comfort,* 282 F.3d 1247, 1255 (10th Cir.2002). While the record is not entirely clear on this question, it appears to this Court that Hall is claiming that § 236(c) violates substantive due process as applied to him, and therefore this Court need not address the facial constitutionality of the statute. Moreover, this Court need only address Hall's procedural due process challenge in the event that it is determined that the statute does not violate his substantive due process rights.

### a. *Nature of the Right*

 The nature of the right which is claimed to be violated determines the level of substantive due process scrutiny that must be applied by the Court, and it is this question to which this Court will turn first.

If the right in issue is a fundamental right, the Court must apply a "strict scrutiny" analysis to determine its constitutionality; if the right is something less than fundamental, a lesser standard of review will apply (typically, either the "rational basis" test or some intermediate level of scrutiny).

This case involves a "liberty interest," that is, the right to be free from government detention without the opportunity for an individualized hearing to address risk of flight and danger to the public.[12] Magistrate Judge Martin concluded, after a review of the decisions of five Circuit Courts of Appeal that have addressed the constitutionality of § 236(c), that the right at issue was not a "fundamental" right. Based on his review of those opinions, and the Supreme Court's guidance in *Zadvydas,* Magistrate Judge Martin determined that Hall's right to an individualized hearing should be examined under a "special justifications" approach. However, this Court concludes that Magistrate Judge Martin misinterpreted the reasoning of those cases, and declines to adopt his Report and Recommendation in this regard. The Court will therefore conduct its own due process analysis, and explain its reluctance to adopt the rationale of Magistrate Judge Martin.

The question of whether the petitioner's asserted liberty interest is a fundamental right is crucial for purposes of substantive due process analysis. *See Reno,* 507 U.S. at 302, 113 S.Ct. 1439. If the liberty interest of the petitioner is fundamental, then applying strict scrutiny, the Court must

---

**12.** Courts that have considered the constitutionality of INA § 236(c) have phrased the liberty interest in various ways. *See, e.g., Gashaj v. Garcia,* 234 F.Supp.2d 661, 666 (W.D.Tex.2002) (right characterized as "the fundamental right to be free from bodily restraint."); *Cardoso v. Reno,* 127 F.Supp.2d 106, 111 (D.Conn.2001) (right characterized as "the right to be free of arbitrary confinement"); *Small v. Reno,* 127 F.Supp.2d 305, 312 (D.Conn.2000) (right characterized as "freedom from restraint without a detention or bond hearing during removal proceedings"); *Baidas v. Jennings,* 123 F.Supp.2d 1052, 1058 (E.D.Mich.1999) (right characterized generally as "right to liberty").

determine whether the statute or regulation infringing on that interest is narrowly tailored to serve a compelling government interest. *See id.*

The Circuit Courts that have addressed the constitutionality of § 236(c) have differed on the question of whether the right asserted by Hall is fundamental. *See, e.g., Welch v. Ashcroft,* 293 F.3d 213, 221 (4th Cir.2002) (right of alien to be free from mandatory detention is not a fundamental one); *Kim v. Ziglar,* 276 F.3d 523, 535 (9th Cir.2002) ("We are reluctant to uphold civil detention impinging on fundamental liberty interests, based on a government policy the need for which the implementing agency has itself questioned."), *cert. granted,* 536 U.S. 956, 122 S.Ct. 2696, 153 L.Ed.2d 833 (2002).[13]; *Hoang v. Comfort,* 282 F.3d 1247 (10th Cir.2002) (holding right to be fundamental), *petition for cert. filed,* No. 01–1616, 2003 WL 2012272, — U.S. —, — S.Ct. —, — L.Ed.2d — (2003); *Patel v. Zemski,* 275 F.3d 299, 310 (3rd Cir.2001) (holding right to be fundamental); *Parra v. Perryman,* 172 F.3d 954, 958 (7th Cir.1999) (determining that alien's liberty interest to be free from mandatory detention was not fundamental).[14] Importantly, there is no First Circuit opinion on this issue.[15]

**13.** On January 15, 2003, the United States Supreme Court heard arguments in *INS v. Kim,* No. 01–1491, which is the government's challenge of the Ninth Circuit's decision in *Kim v. Ziglar,* 276 F.3d 523 (9th Cir.2002), a decision that declared § 236(c) unconstitutional as applied to LPRs. The Solicitor General, arguing on behalf of the INS, presented the mandatory detention provisions of § 236(c) as a necessary means to effectuate Congress' immigration policies, which demand significant deference from the courts. *See* Brief for the Petitioners, *Kim,* No. 01–1491. The Respondent, and various *amici,* argued that the Ninth Circuit correctly ruled that § 236(c) is unconstitutional as applied to LPRs because it provides no opportunity for an individualized bail hearing. *See* Brief for the Respondent, *Kim,* No. 01–1491. The decision in this case may well provide further guidance with respect to how the Supreme Court views the mandatory detention provisions of Section 236(c). For obvious reasons this Court is reluctant to defer ruling on this petition in hope that the high Court will provide further guidance on this issue in the near future. It is important to recognize, however, that the decision in this case may well be affected by the outcome of *Kim.*

Moreover, this Court is also acutely mindful of the fact that the issue presented by this case comes at a time of increased national security concerns over the problem of illegal aliens residing in the United States, some of whom have ties to terrorist organizations, and may intend to inflict harm to our country and our people. These concerns are very real, and cannot be understated, *Zadvydas,* 121 S.Ct. at 2499 (specifically treating terrorism as a special situation that inherently involves a great risk of flight and danger to the community). However, the decision in this case must be guided by the principles of substantive due process law, as they have been defined by the Supreme Court, and not by the increased fear and uncertainty created by modern day security concerns, however valid they may be. As the *Zadvydas* Court makes clear, potential ties to terrorist organizations are the kind of risks that a judge must consider in assessing risk of flight and danger to the community. In other words, the requirement of an individualized hearing in no way diminishes this concern; rather it requires consideration of these matters on a case by case basis.

**14.** The *Parra* case was decided prior to the Supreme Court's recent holding in *Zadvydas.* As a result, its holding limiting the due process rights of aliens has arguably been weakened.

**15.** However, this District has addressed the issue on at least two separate occasions. *See Podoprigora v. INS,* C.A. No. 01–202L (D.R.I. Apr. 22, 2002) (Lagueux, J.) (adopting the Report and Recommendation of Magistrate Judge Lovegreen finding § 236(c) constitutional); *Cesar v. INS,* C.A. No. 01–590 ML, Report and Recommendation dated 9/17/02 (Hagopian, M.J.) (finding that § 236(c) implicated a fundamental right and was unconstitutional as applied to the LPR petitioner. Magistrate Judge Hagopian's Report and Rec-

Magistrate Judge Martin, relying primarily on the Fourth Circuit's ruling in *Welch*, applied a "special justifications approach," *see Zadvydas*, 533 U.S. at 690, 121 S.Ct. 2491, as opposed to a fundamental rights analysis. In *Welch*, the Fourth Circuit, while noting that the liberty interest implicated by mandatory detention under § 236(c) "is unquestionably significant," held that such a liberty interest was not fundamental. 293 F.3d at 221. The *Welch* opinion, however, in this Court's view, does not provide a solid footing for the conclusion reached by the Magistrate Judge. In *Welch*, the Fourth Circuit relied on language from *Salerno*, which it claimed provided support for its conclusion that the Supreme Court does not recognize liberty from physical detention as a fundamental right. The *Welch* court stated:

> In *Salerno*, the sole opinion on which the district court relied, the Supreme Court describes liberty from physical restraint as being of a "fundamental nature." But the *Salerno* Court goes on to say that it cannot "categorically state that pretrial detention 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"

*Welch*, 293 F.3d at 221 (citations omitted). However, a careful reading of *Welch* reveals that the Fourth Circuit, in the above quoted passage, carefully parsed the language of *Salerno* so as effectively to alter its meaning. The cited passage of *Salerno*, in full, reads as follows:

> On the other side of the scale, of course, is the individual's strong interest in liberty. We do not minimize *the importance and fundamental nature of this right.* But, as our cases hold, this right may, in circumstances where the govern-

ment's interest is sufficiently weighty, be subordinated to the greater needs of society.... When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, we believe that, consistent with the Due Process Clause, a court may disable the arrestee from executing that threat. Under these circumstances, we cannot categorically state that pretrial detention "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."

481 U.S. at 750–51, 107 S.Ct. 2095 (internal citation omitted)(emphasis added). The *Salerno* Court thus held that while the liberty interest to be free from detention *is fundamental*, it can be overcome (as it was in that case) by a compelling government interest, which interest is determined after a hearing consistent with the Due Process Clause. The *Salerno* Court did not indicate, as the *Welch* court (and in turn Magistrate Judge Martin relying thereon) believed, indicate that the liberty interest to be free from mandatory government detention was not a fundamental right.

In *Zadvydas*, the Court ruled that the government's detention of aliens is only permissible when it can show that a "special justification ... outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" 533 U.S. at 690, 121 S.Ct. 2491 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)). Some courts, including *Welch*, have interpreted this language from *Zadvydas* as creating a new approach to the analysis of the constitutionality of mandatory detention in the immigration context. However, *Zadvydas*

ommendation was never adopted by Judge Lisi because the matter became moot subsequent to the issuance of the Report and Rec-

ommendation, but prior to any action by Judge Lisi).

did not create a new approach for determining whether mandatory detention in the immigration context violates due process. As in *Salerno,* any "special justifications" that might exist in a particular situation are to be viewed as counterweights to the individual's right to be free from mandatory restraint—not as a separate, less demanding due process analysis.[16] Thus, the "special justifications" referred to in *Zadvydas* effectively are the proof of the compelling government interest that must be demonstrated under strict scrutiny.

Two other Circuit Courts have described the holding of *Zadvydas* this way, and have held that the right of an alien to be free from mandatory government detention absent an individualized bail hearing is a fundamental right. *See Hoang,* 282 F.3d at 1257; *Patel,* 275 F.3d at 309. In *Hoang,* the Tenth Circuit held that aliens have a fundamental liberty interest in freedom from mandatory detention. In reaching this conclusion, the court relied heavily on *Salerno* and *Zadvydas:*

> Even in the context of aliens, government detention violates the Due Process Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections, or in "certain special and narrow non-punitive circumstances ... where a special justification ... outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas,* 121

S.Ct. at 2499. In *Salerno,* the Court recognized that a person who is detained pending trial has a fundamental liberty interest in freedom from restraint. The liberty interest of a person who is detained pending deportation proceedings is no less fundamental. As a result, we conclude that the petitioners have a fundamental liberty interest in freedom from detention pending deportation proceedings that may only be infringed upon in certain limited circumstances. 282 F.3d at 1257 (internal citations and parenthetical omitted). In other words, the court determined that the liberty interest at issue is a fundamental right, which can be infringed upon only if the government can establish a "special justification" for doing so.

Likewise, in *Patel,* the Third Circuit relied on *Zadvydas* to conclude that immigration detention implicates a fundamental liberty interest. *Id.* ("In reaching this decision, the Court stated that a 'statute permitting indefinite detention of an alien would raise a serious constitutional problem.' ... '[F]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.' ").

This Court believes that the Tenth and Third Circuit Courts of Appeal more accurately applied the Supreme Court's fundamental rights analysis, as set forth in *Sal-*

---

**16.** It is interesting to note that the *Welch* court's reliance on a "special justifications" approach appears similar to the outdated "special public-interest" doctrine that courts once utilized when undertaking an equal protection analysis of laws containing alienage classifications. In those instances, the Supreme Court allowed aliens to be treated less favorably than others when the classification related to a "special public interest." *See, e.g., Ohio ex rel. Clarke v. Deckebach,* 274 U.S. 392, 398, 47 S.Ct. 630, 71 L.Ed. 1115 (1927).

The "special public interest" doctrine has since been eroded in most contexts. *See Graham v. Richardson,* 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 418, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). Alienage classifications are now reviewed under a strict scrutiny analysis. This further supports the view that the Supreme Court in *Zadvydas* did not intend for "special justification" to become a separate, less rigorous level of constitutional scrutiny.

*erno* and *Zadvydas.* The reasoning of *Hoang* and *Patel* compels a finding that Hall, indeed, has a fundamental right in not being detained by the government pending his deportation, absent an individualized bail hearing—a hearing at which the INS may demonstrate what, if any, "special justifications" compel his detention pending the outcome of his deportation hearing appeal.

It is, of course, true that the foregoing cases all involved LPRs (not illegal aliens) detained under § 236(c) pending deportation. Hall is an illegal alien, with no legal basis for remaining in the United States. However, this fact alone does not eviscerate Hall's right not to be detained by the government pending deportation absent a hearing. In *Zadvydas,* the Court implied that the extent of due process protection may vary depending on the status and circumstances of the alien. 533 U.S. at 694, 121 S.Ct. 2491. While Hall is not a legal permanent resident, his time in this country has not been brief. Hall entered

the United States in 1973 on a tourist visa, and has remained (albeit illegally) in this country since the visa's expiration—a period of nearly twenty years. His entire family lives in the United States. He has been detained by the INS for the past three years pending a final decision on his § 212 adjustment of status application which was heard by an immigration judge on December 5, 2002.[17] These circumstances endue Hall with increased substantive due process protections.

Hall's substantive due process rights lie somewhere between those afforded an LPR, and the minimal, nearly non-existent protections afforded to excludable aliens.[18] While the exact point on the spectrum of constitutional protection may be difficult to pinpoint, in the view of this Court it falls closer to the LPR side than the excludable side, particularly given Hall's length of time in the United States, family ties and other circumstances that connect him to this country.[19]

**17.** Courts have held that the length of time an alien is detained is a critical factor in determining the constitutionality of § 236(c). *See Zadvydas,* 533 U.S. at 688–701, 121 S.Ct. 2491; *Salerno,* 481 U.S. at 747, 107 S.Ct. 2095. In fact, the Solicitor General argued in his brief to the Supreme Court in *Kim* that most pre-deportation detentions are brief, and therefore no bail hearing is merited. However, even the Solicitor General acknowledged that "exceptional circumstances" resulting in lengthy detention are appropriate for review on "a case-by-case basis." *See also* Brief for the Petitioners at 48; *Kim,* No. 01–1491. While the holding of this case is not dependent on the length of Hall's detention, it appears that Hall's detention would be just such an "exceptional circumstance." Moreover, this writer disagrees with Magistrate Judge Martin's characterization that Hall has held the keys to his freedom in his own hands, and has prolonged his detention by appealing his deportation. This conclusion implies that Hall may be essentially punished for exercising due process rights to which he is indisputably entitled.

**18.** *But see Rosales–Garcia v. Holland,* No 99–5683, 322 F.3d 386, 410 (6th Cir.2003) (en banc) ("The fact that excludable aliens are entitled to less process, however, does not mean that they are not at all protected by the Due Process Clauses of the Fifth and Fourteenth Amendments. If excludable aliens were not protected by even the substantive component of constitutional due process, as the government appears to argue, we do not see why the United States government could not torture or summarily execute them. Because we do not believe that our Constitution could permit persons living in the United States-whether they can be admitted for permanent residence or not-to be subjected to *any* government action without limit, we conclude that government treatment of excludable aliens *must* implicate the Due Process Clause of the Fifth Amendment.").

**19.** This Court recognizes that for the majority of the time Hall has been in the United States he has been here illegally. In addition, while here, he has committed several serious crimes. It does seem incongruous to reward

This holding is consistent with at least one other court that has ruled that aliens in Hall's situation have a right to be free from mandatory detention absent an individualized bail hearing. *See Radoncic v. Zemski,* 121 F.Supp.2d 814 (E.D.Pa.2000), *aff'd,* 28 Fed.Appx. 113, 2001 WL 1681643 (3rd Cir.2001), *petition for cert. filed,* 70 U.S.L.W. 3642 (U.S. Apr. 4, 2002) (No. 01–1459). In *Radoncic,* the petitioner, an illegal alien, contended that his detention without a bail hearing pursuant to § 236(c) violated his procedural and substantive due process rights. The petitioner had entered the United States in 1991, and was taken into custody in May of 2000 after serving a sentence for a federal conviction. Later that year, the petitioner filed a writ of habeas corpus challenging his detention. The court held that "due process requires a current individualized evaluation to determine whether his continued indefinite detention is necessary to prevent a risk of flight or a threat to the community." 121 F.Supp.2d at 818. The court determined that, while the petitioner did not have an "absolute right to liberty" pending final removal, an individualized assessment of the petitioner's situation was required in order to comport with substantive due process. *Id.* Drawing on the distinction between excludable and deportable aliens, the court determined that illegal aliens that have effected entry into the United States should be afforded greater substantive due process rights than those aliens who have yet to enter the country. *Id.* at 816–17.

This Court concludes that Hall has a fundamental right to be free from mandatory detention without a bail hearing.

b. *Level of Scrutiny*

■ Because § 236(c) implicates Hall's fundamental right to be free from mandatory detention, the Court must apply a heightened level of scrutiny to determine whether § 236(c)'s infringement on that right is narrowly tailored to serve a compelling state interest. *Flores,* 507 U.S. at 301–02, 113 S.Ct. 1439; *Patel,* 275 F.3d at 310. As outlined above, in order to assess whether the INS has provided sufficiently compelling reasons for the infringement, the Supreme Court has directed courts to determine whether there are "special justifications that outweigh the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas,* 533 U.S. at 690, 121 S.Ct. 2491 (citing *Salerno,* 481 U.S. at 746, 107 S.Ct. 2095). The INS contends that the mandatory detention provision of § 236(c) is necessary in order to serve two primary purposes: ensuring that aliens do not abscond pending their final removal, and protecting the community from further criminal acts or other dangers.

The INS contends that § 236(c) is necessary to protect against the risk of flight by deportable aliens. There is no question that the INS has a compelling interest in ensuring that deportable aliens are present at the time their deportation proceedings become final. However, § 236(c) *assumes* that an alien awaiting deportation from the United States will not appear for

---

Hall for his ability to prolong his unlawful activity by affording him greater constitutional protections. By the same token, the Supreme Court has held that aliens have the right to procedural due process, including a hearing prior to deportation. *See* 8 U.S.C. § 1252(b); *Ng Fung Ho v. White,* 259 U.S. 276, 281, 42 S.Ct. 492, 66 L.Ed. 938 (1922).

*See generally* 5 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law Substance and Procedure* § 22.7 (3d ed.1999). It would seem equally incongruous to conclude that an alien is afforded due process protections prior to final removal from the United States, but not during the period of the deportation process leading up to final removal.

his or her final hearing or will abscond while awaiting a decision on appeal. The Tenth Circuit put in well in *Hoang:* "[r]ather than establishing a procedure to determine which aliens might be flight risks, [§ 236(c) ] establishes an irrebuttable presumption that all aliens to which mandatory detention applies are flight risks." 282 F.3d at 1259. This Court agrees with this assessment.

It is certainly likely that some aliens awaiting final deportation from the United States would take "a nothing else to lose" approach if freed from detention pending final removal, and would abscond. However, as § 236(c) currently exists, *every* alien in the United States that is awaiting deportation is presumed to be a flight risk. This presumption is counter-intuitive, and belied by the empirical data available. In *Hoang* and *Patel,* the Tenth and Third Circuit Courts respectively cited statistics indicating that prior to the enactment of § 236(c)'s mandatory detention provision, nearly 80% of non-detained aliens appeared for their final removal hearing. 275 F.3d at 311–12, 282 F.3d at 1259. This Court is hard-pressed to understand how § 236(c)'s irrebuttable presumption of flight risk can withstand the reality of these statistics.[20]

It is clearly possible that when the facts concerning Hall are presented to a judge, it may be determined that he poses an actual flight risk. Nonetheless, substantive due process requires "a close nexus between the government's goals and the deprivation of the interest in question." *Patel,* 275 F.3d at 311. Absent an individualized hearing process to determine Hall's likelihood of flight, the government cannot demonstrate the required nexus between § 236(c)'s mandatory detention requirement and the government's interest in preventing a deportable alien from fleeing pending the final outcome of his appeal.

The government also asserts that the danger an alien poses to the community is sufficiently compelling to justify mandatory detention. As with the risk of flight, there is no question that some aliens awaiting deportation from the United States pose a potential danger to the community.[21] Likewise, the Court does not dispute that the government has a compelling interest in protecting communities from dangerous individuals, nor does it dispute the seriousness of the problem of recidivism among the criminal alien population. However, as with risk of flight, § 236(c) applies a blanket, irrebuttable presumption that every alien awaiting deportation is a danger and must be detained.

The problem with this presumption is compounded by the fact that § 236(c) applies to all aliens that have been convicted of what is termed an "aggravated felony." 8 U.S.C. § 1226(c); 8 U.S.C. § 1101(a)(43). The term "aggravated felony" is defined extremely broadly and includes a wide range of crimes. *See* 8 U.S.C.

20. In its brief in *Kim* the Solicitor General argues forcefully that the statistics tell a different story. According to the Solicitor General, the more relevant statistic is that, prior to the enactment of § 236(c), ninety percent of those aliens released pending deportation did not appear for their final deportation hearing. *See* Brief for the Petitioners at 13, *Kim,* No. 01–1491.

21. For example, the Solicitor General's brief to the Supreme Court indicated that Congress has previously found the INS' failure to remove recidivist criminal aliens was "imposing a significant cost on our society." Criminal aliens in federal and state prisons cost taxpayers $724 million dollars a year and are the fastest growing segment of the federal prison population comprising 25% of all federal inmates. *See* Brief for the Respondents at 17, *Kim,* No. 01–1491.

§ 1101(a)(43); *Kim*, 276 F.3d at 531–32. There is little question that many aliens convicted of aggravated felonies would, in fact, pose a threat to the community if released on bond (i.e., murderers, rapists, child molesters, drug traffickers to name just a few); but the presumption cannot so easily be applied to aliens convicted of aggravated felonies such as document fraud, mail theft, perjury, or crimes of moral turpitude with sentences in excess of one year. Moreover, § 236(c) takes no account of other obvious factors such as age and physical state. It seems clear that an elderly and/or physically disabled deportable alien who committed document fraud would be less likely than a violent criminal in excellent health to be a danger to the safety of the community such that detention would be required. Absent an individualized hearing to assess the danger posed by each individual, a statute that simply assumes that every alien convicted of an "aggravated felony" is a danger to the community is not sufficiently narrowly tailored to address the compelling government interest of preventing the absconding of aliens pending deportation and/or protecting public safety.

At an individualized bail hearing, an immigration judge may very well determine that the 55 year old Hall's prior conviction for armed robbery in 1983 poses a sufficient basis to conclude that he is a danger to the community. However, for § 236(c)

simply to presume that Hall is dangerous without the opportunity to rebut that presumption violates his substantive due process rights.[22]

## IV. *Conclusion*

This Court holds that the mandatory detention of Hall under INA § 236(c) with no opportunity for an individualized hearing to determine whether he is a flight risk or a danger to the community violates Hall's substantive due process rights afforded him under the Fifth Amendment to the United States Constitution.[23] This Court orders the INS to hold a prompt hearing at which an individualized determination of Hall's risk of flight and danger to the community may be assessed, and an appropriate determination may be made with respect to whether he should be detained or released pending the final outcome of his appeal.

Additionally, Hall's claims seeking the return of documents and damages for physical and emotional abuse are DISMISSED without prejudice.

It is so ordered.

---

**22.** A review of Hall's background further supports the inappropriateness of this presumption. While Hall was in the custody of Massachusetts correctional authorities (for the crime for which he now faces deportation), Hall frequently worked in the community on parole-release work programs and frequently spent weekends at home with his parents. Indeed, Magistrate Judge Martin noted in his Report and Recommendation that Hall may not even be a flight risk given his background. *See* Report and Recommendation at 17–18, n. 14.

**23.** Because § 236(c) violates Hall's substantive due process rights, the Court need not address Hall's procedural due process deprivation argument. As the Fourth Circuit has explained, procedural due process challenges to the requirement of mandatory detention under § 236(c) "collapse into" the substantive due process challenge. *Welch*, 293 F.3d at 218 n. 4.